BEATRICE FOODS CO., Appellant,

v.

UNITED STATES of America, Appellee.

No. 16899.

United States Court of Appeals
Eighth Circuit.

Jan. 2, 1963.

32

George B. Christensen, of Winston, Strawn, Smith & Patterson, Chicago, Ill., Lyle E. Strom and Edgar R. Geesaman, of Fitzgerald, Hamer, Brown & Leahy, Omaha, Neb., on the brief, for appellant.

Donald L. Hardison, Atty., Dept. of Justice, Washington, D. C., Lee Loevinger, Asst. Atty. Gen., and Richard A. Solomon, Earl A. Jinkinson, James E. Mann and Robert L. Eisen, Attys., Dept. of Justice, Washington, D. C., on the brief, for appellee.

Before VAN OOSTERHOUT and BLACKMUN, Circuit Judges, and HENLEY, District Judge.

BLACKMUN, Circuit Judge.

This is an appeal from the judgment entered upon a jury verdict that the defendant Beatrice Foods Co. was guilty of a conspiracy made illegal by § 1, as amended, of the Sherman Act, 15 U.S.C. § 1. A fine of $15,000 was imposed.

The indictment was returned in August 1958. It named Beatrice, Roberts Dairy Company and Alamito Dairy Company as defendants. All three defendants were engaged in the dairy business in the Omaha-Council Bluffs area. The indictment contained one count which charged that from January 1954 to April 1957 the defendants, in violation of the Act, "have engaged in a combination and conspiracy to eliminate and suppress competition in the sale of milk and cream" to the United States Veterans Administration Hospital in Omaha and to the United States Offutt Air Force Base near that city. Some of the specific features of the charge are quoted in the margin.[1]

1. "The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding, and concert of action among the defendants the substantial terms of which were:
"(a) To fix and establish non-competitive prices and discounts for milk and cream sold and distributed to the Offutt AFB;
"(b) To fix and establish non-competitive prices and discounts for milk and cream sold and distributed by the defendants to the Veterans Hospital;

"(c) To allocate to the defendant Roberts, the bid contract business of supplying milk and cream to the Veterans Hospital;
"(d) To alternately allocate to the defendants Alamito and Beatrice the bid contract business of supplying milk and cream to the Offutt AFB.
* * * * *
"The combination and conspiracy alleged in this indictment has had, among other things, the following effects:

Roberts and Alamito submitted pleas of nolo contendere. These were eventually accepted by the court. Those two defendants were then adjudged guilty and a fine of $5,000 was imposed upon each of them.

Beatrice, the remaining defendant, moved, pursuant to Rule 6(b)(2), F.R. Cr.P., to dismiss the indictment for the reason that the grand jury which returned it "was drawn from a jury list which was not properly or lawfully selected". After a hearing this motion was denied. Beatrice then entered a plea of not guilty. On the basis of an affidavit of one of its attorneys Beatrice also moved to quash the indictment "because the indicting grand jury's sessions and deliberations were tainted and defendant was prejudiced by repeated acts of misconduct by the United States attorneys before said jury".

The case proceeded to trial. At the close of the government's evidence Beatrice moved for a judgment of acquittal and rested. The adverse verdict was returned and judgment was entered. Beatrice then renewed its motions for dismissal of the indictment and for judgment of acquittal and asked in the alternative for a new trial. These motions were all denied.

The defense urges here (1) improper selection of the grand jury; (2) mis-conduct of government counsel before the grand jury; (3) insufficiency of the evidence; (4) error in the reception of evidence, and (5) error in the instructions. We examine these points in turn and recite the pertinent facts as each is considered.

1. *The challenge to the grand jury array.* The governing statutes are 28 U.S.C.A. §§ 1861 and 1864. The former[2] prescribes as qualifications for both grand and petit jurors (a) United States citizenship; (b) attained age of 21 years; (c) one year's residence within the judicial district; (d) absence of a criminal record of the kind described in the statute; (e) ability to read, write, speak and understand English; and (f) mental and physical capacity to render efficient jury service. This section was given its present form on September 9, 1957, by the Civil Rights Act of 1957, Pub.L. 85–315, Part V, § 152, 71 Stat. 634, 638. Theretofore, the statute had required only residence in the district, rather than at least one year's residence there, and had also provided that one who was incompetent to serve as a juror by the law of the state where the federal court sat was also incompetent to serve as a federal juror.

Section 1864[3] provides that the names of grand jurors shall be drawn from a box containing the names of not less than

---

"(a) Prices paid by the Veterans Hospital and Offutt AFB for milk and cream have been artificially fixed at high and non-competitive levels; * * *.

"(f) Competition among defendants in the sale of milk and cream to the Offutt AFB and the Veterans Hospital has been substantially lessened and eliminated."

2. "§ 1861. Qualifications of Federal jurors
"Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—

"(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

"(2) He is unable to read, write, speak, and understand the English language.

"(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service."

3. "§ 1864. Manner of drawing; jury commissioners and their compensation
"The names of grand and petit jurors shall be publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing.

"The jury box shall from time to time be refilled by the clerk of court, or his deputy, and a jury commissioner, appointed by the court.

* * * * *

"The jury commissioner and the clerk, or his deputy, shall alternately place one name in the jury box without reference to party affiliations, until the box shall contain at least 300 names or such larger number as the court determines. * * *"

300 then qualified persons and that the box shall be refilled from time to time by the clerk of the court and a jury commissioner having prescribed qualifications.

Beatrice's position is that § 1864 is mandatory and requires the clerk and the commissioner to place the names of 300 or more qualified persons in the box; that this duty of selection may not be delegated; that the procedure the clerk followed in selecting names for this grand jury did not meet the statutory requirements; and that Beatrice need not demonstrate individual prejudice to it by the selection procedures employed.

At the hearing on the motion to dismiss the indictment the following facts were developed and are not in dispute:

Mary A. Mullin was the clerk. She served in that capacity since 1939. The jury commissioner was G. V. Middleton. He was appointed in 1955. He died in July 1958. The Court's order for the grand jury was issued on October 23, 1957, only one month and two weeks after § 1861 was amended. The jury was drawn on November 6, was empaneled the following February, was excused for a time, and was reconvened in August 1958 when the indictment of the three defendants was returned.

Miss Mullin, since her appointment as clerk, maintained a list of prospective jurors. She kept this "revised constantly". Names and addresses were placed on cards. Names of women were on blue cards and those of men were on white cards. Middleton maintained his own card record. His was separate and apart from the clerk's and was not under her direction or supervision. His cards were orange. Miss Mullin had no knowledge as to how Middleton obtained his names. When this grand jury was empaneled Miss Mullin placed not less than 150 of her cards in the box and Middleton placed not less than 150 of his cards there. The clerk and Middleton did this by placing cards one at a time alternately in the box. Miss Mullin testified that she apportioned blue cards and white cards consistently but that she had no idea as to

the proportion of the one group to the other.

■ The clerk employed the sponsor system practice of sending to certain persons in the district requests for recommendations of prospective federal jurors. The form she used for this purpose quoted § 1861 in full. It provided choices for names of men or of women or of both men and women; upon any particular use of this form she crossed out two of these three alternatives. She in fact requested names of persons of both sexes from time to time. On at least one occasion she used the form to ask for names of colored men.

When Miss Mullin received recommendations from her sources she checked the names submitted against her existing list. She then sent a mimeographed questionnaire to each person whose name was not already on her list. She did not add a name to the list upon its mere presentation by a sponsor.

The questionnaires were of two types. Each bore the name of the clerk and advised the recipient that he was a prospective federal juror. Each asked his age, occupation and address, and whether he was a voter. One type, the older, asked whether he was a federal employee. The other asked the name of his employer and whether he owned real estate in his own name. Miss Mullin conducted no personal interview with any prospective juror.

There was no evidence presented as to how the names on Middleton's list were selected.

It is important to note that Beatrice does not attack the indictment on the grounds (a) that any particular person on this grand jury was in any way not qualified, or (b) that the required number of names was not in the jury box, or (c) that the jury was not representative of the community in that an eligible group had been excluded in its selection. See, as to this last factor, Thiel v. Southern Pacific Co., 1946, 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181; Ballard v. United States, 1946, 329 U.S. 187, 195,

67 S.Ct. 261, 91 L.Ed. 181; Hoyt v. Florida, 1961, 368 U.S. 57, 59, 82 S.Ct. 159, 7 L.Ed.2d 118; Smith v. Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84. Neither has Beatrice suggested or offered to prove individual prejudice to it as a defendant.

The attack, instead is directed to claimed deficiencies in the mechanics of the selective process. It is argued that the letters to the sponsors and the questionnaires "do not begin to provide sufficient information to determine whether or not that person is qualified to act as a federal juror under" § 1861, particularly with respect to the English language requirement, criminal record, infirmities, and the one year residence newly prescribed by the 1957 amendment. It is then said that the record clearly establishes that Miss Mullin did not know whether the names she placed in the box were those of qualified persons, that this is a breach of statutory duty, and that it is fatal to the indictment.

 It was suggested long ago that the placing of names of *qualified* persons in the jury box is mandatory. United States v. Chaires, C.C.N.D.Fla., 1889, 40 F. 820, 821. Since then, some courts have specifically so held. United States v. Silverman, D.Conn., 1955, 129 F.Supp. 496, 511; United States v. Brandt, N.D. Ohio, 1955, 139 F.Supp. 362, 365. It has been said, too, that the duty of selection cannot be delegated by jury officials. Glasser v. United States, 1942, 315 U.S. 60, 85, 62 S.Ct. 457, 86 L.Ed. 680. However, Congress has prescribed no particular method of jury selection. "The choice of the means * * * rests largely in the sound discretion of the trial courts and their officers" under the guidance of the pertinent statutes. Thiel v. Southern Pacific Co., supra, pp. 220–221 of 328 U. S. p. 986 of 66 S.Ct.; Glasser v. United States, supra, p. 86 of 315 U.S. 457 of 62 S.Ct. There is a presumption that the jury officials have discharged their duties properly. Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, 110, cert. den. 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597; United States v. Charles Kazuyuki

Fujimoto, D.Hawaii, 1952, 105 F.Supp. 727, 729. When the defense claims the existence of a fatal flaw in the selection process it has the burden of overcoming that presumption. Frazier v. United States, 1948, 335 U.S. 497, 503, 69 S.Ct. 201, 93 L.Ed. 187; United States v. Silverman, supra, p. 511 of 129 F.Supp.; Walker v. United States, 8 Cir., 1937, 93 F.2d 383, 392, cert. den. 303 U.S. 644, 58 S.Ct. 642, 82 L.Ed. 1103; Bailey v. Henslee, 8 Cir., 1961, 287 F.2d 936, 942, cert. den. 368 U.S. 877, 82 S.Ct. 121, 7 L. Ed.2d 78.

 Accepting all this, we are not persuaded by Beatrice's challenge to the array:

(a) When the jury officials themselves are the ones who ultimately determine a juror's qualification, the sponsor system is not in itself an invalidating factor. Walker v. United States, supra, p. 391 of 93 F.2d, where this court said that this "was not a delegation, but a discharge of duty"; United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, 216–224, affirmed 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Padgett v. Buxton-Smith Mercantile Co., 10 Cir., 1960, 283 F.2d 597, 598, cert. den. 365 U.S. 828, 81 S.Ct. 713, 5 L.Ed.2d 705; United States v. Silverman, supra, p. 510 of 129 F.Supp.; United States v. Silverman, D.Conn., 1955, 132 F.Supp. 820, 823–827; United States v. Romano, D. Conn., 1961, 191 F.Supp. 772; United States v. Brandt, N.D.Ohio, 1955, 139 F. Supp. 349, 360; United States v. Hoffa, S.D.Fla., 1952, 205 F.Supp. 710, 719–720. Here a sponsor's recommendation was not the sole feature of the selection process. It was coupled as to each prospect with a questionnaire directed to most of the qualifications specified by the statute. Although certain of the requests to sponsors were limited as to sex, the requests, taken as a group, were not so limited and the one requesting names of Negro males was sent to a deputy federal court clerk who was himself a Negro and who reasonably might be expected to possess usefully wide acquaintanceship with others of his race. Also, the law does not contemplate that the jury officials be per-

sonally acquainted with each prospective juror. Walker v. United States, supra, p. 391 of 93 F.2d.

(b) The fact that the clerk and the jury commissioner maintained separate lists does not seem to us to disqualify the panel. We find nothing in § 1864 which requires that both jury officials pass upon the qualifications of each prospective juror even though it obviously is desirable that they do so. The policy of the statute is that the jury box be refilled by both acting alternately. It does not appear to go so far as to require agreement upon each name. Compare United States v. Clancy, 7 Cir., 1960, 276 F.2d 617, 625, reversed on other grounds, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574; Local 36, etc., v. United States, 9 Cir., 1949, 177 F.2d 320, 341, cert. den. 339 U.S. 947, 70 S.Ct. 801, 94 L.Ed. 1361.

(c) The questionnaires employed were not as desirably complete as they might have been. They did not inquire, for example, as to a prospect's fluency in English, as to his criminal record and as to his mental and physical capacities. Yet they did advise him of the purpose of the questionnaire itself and they did inquire as to his being a voter. The filling out of the form and its return would result in some indication of the prospect's language ability and of his infirmities. Voting status under Nebraska law would presumably show United States citizenship, at least six months' residence in the district, R.R.S.Neb.1943 § 32–102, and something as to criminal record, R.R.S. Neb. §§ 29–112 and 29–102. The information requested as to age, occupation and employer is not completely unrevealing as to capacity. Furthermore, the letter to each sponsor quoted § 1861. The sponsor therefore knew exactly what was required for those he was to recommend as prospective jurors. We are not free to presume that he ignored these requirements.

(d) It is evident, as Beatrice urges, that the questionnaires were not so complete or so helpfully informative as the one given as an example in the September 1960 Report of the Judicial Conference Committee on the Operation of the Jury System, 26 F.R.D. 409, 507–508. But such deficiencies as they possessed were largely overcome by the answers which were necessarily forthcoming, by the natural tendency to make one's physical infirmities known, and by the court's own authority to excuse unqualified prospective jurors. United States v. Brandt, supra, p. 365 of 139 F.Supp. The 1960 Report itself states that its suggested questionnaire "need not be rigidly adhered to". 26 F.R.D. 436.

(e) Nor do we think the fact that the box may have contained names which were on the jury officials' respective lists prior to the 1957 amendment imposing the one-year residence requirement is fatal. See Glasser v. United States, supra, p. 65 of 315 U.S., p. 462 of 65 S.Ct. Compare United States v. Dennis, supra, pp. 217–218 of 183 F.2d; United States v. Flynn, 2 Cir., 1954, 216 F.2d 354, 385, cert. den. 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713. This jury was drawn less than two months after that amendment. And the evidence does not disclose that the residency requirement was not met as to these grand jurors. See United States v. Austrew, D.Md., 1961, 190 F. Supp. 632, 634.

(f) We do not regard United States v. Silverman, supra, 129 F.Supp. 496, and United States v. Brandt, supra, 139 F. Supp. 362, as opposing authority. In Silverman the request to sponsors gave no information whatever as to the statutory qualifications and the questionnaires employed were sent out only after the drawing. Thus there was no determination by the jury officials themselves of the qualifications of the prospects. Compare the disposition of the second challenge in United States v. Silverman, supra, pp. 823–827 of 132 F.Supp. In Brandt the challenge to the array was not successful.

(g) The facts here fall far short of the more material situation where an entire cohesive group is excluded in the jury selection process. There the jury system itself is threatened and as a consequence prejudice to the particular de-

fendant need not be demonstrated. Thiel v. Southern Pacific Co., supra, pp. 220–221 and 225 of 328 U.S., p. 988 of 66 S. Ct.; Ballard v. United States, supra, p. 195 of 329 U.S., p. 265 of 67 S.Ct.

(h) Although perfection in jury selection is of course desired, it is too much to expect that the system in every federal judicial district will be conducted and will operate with the precision of a fine timepiece. Perfect performance is not required. United States v. Brandt, supra, p. 365 of 139 F.Supp. This is why we have the many safeguards consisting of the use of the box itself, the drawing of names from it, the large number of names required, and the like. At the very most, there were mere irregularities in the selection of the grand jury which indicted Beatrice and its codefendants. In the absence of individual prejudice to the defendant, these do not justify dismissal of the indictment. Agnew v. United States, 1897, 165 U.S. 36, 44, 17 S.Ct. 235, 41 L.Ed. 624; Young v. United States, 1954, 94 U.S.App.D.C. 54, 212 F. 2d 236, 238–239 and footnote 5, cert. den. 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137. See Frazier v. United States, supra, pp. 503–504 of 335 U.S., p. 205 of 69 S.Ct. Compare United States v. Greenberg, S.D.N.Y., 1961, 200 F.Supp. 382, 387. We equate this feature of this case with the situations involved in United States v. Clancy, 7 Cir., 1960, 276 F.2d 617, 625, 631–632, reversed on other grounds, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574; United States v. Dennis, supra, 2 Cir., 1950, 183 F.2d 201; Local 36, etc., v. United States, supra, 9 Cir., 1949, 177 F.2d 320, 341; Abdul v. United States, 9 Cir., 1960, 278 F.2d 234, 235, cert. den. 364 U.S. 832, 81 S.Ct. 44, 5 L. Ed.2d 58; Romney v. United States, 1948, 83 U.S.App.D.C. 150, 167 F.2d 521, 527, cert. den. 334 U.S. 847, 68 S.Ct. 1512, 92 L.Ed. 1771; Padgett v. Buxton-Smith Mercantile Co., supra, 10 Cir., 1960, 283 F.2d 597, 599. See Brookman v. United States, 8 Cir., 1925, 8 F.2d 803, 806–807; Gaughan v. United States, 8 Cir., 1927, 19 F.2d 897, 898–899. Compare Walker v. United States, supra, p. 391 of 93 F.2d.

We note, incidentally, that the Nebraska jury selection system employed by this clerk and this jury commissioner was carefully reviewed once before and was upheld by Chief District Judge Delehant in an unreported memorandum filed September 24, 1956, in United States v. Brown, reversed on other grounds, 8 Cir., 1957, 245 F.2d 549. We, too, conclude that the system was not disqualifying and that the challenge to the array must fail.

2. *Misconduct of government counsel before the grand jury.* On the day the trial was to begin, more than thirty-two months after the return of the indictment, Beatrice moved that the grand jury minutes be produced for inspection by the defense and the court and that the indictment be dismissed because of misconduct of non-local government attorneys before the grand jury. This motion was supported by an affidavit of one of the attorneys for Beatrice to the effect that, immediately following their appearance before the grand jury in 1958, three witnesses, all agents or employees of Roberts, recorded on tape what had transpired before the grand jury and that the tape reflects instances of belligerency toward these witnesses, accusations of lying, threats of prosecution for perjury, and assertions of the very matter under consideration by the grand jury. In denying this motion and its renewal after judgment the court stated that government counsel had produced the grand jury transcript "and the Court having carefully read and studied the entire Grand Jury transcript in camera, finds that the allegations contained in the affidavit * * * are not supported by the record and therefore are without foundation and should be overruled".

Beatrice argues here that the affidavit stands uncontradicted in the record; that the conduct of government counsel was an abuse of the limited function of the prosecutor before the grand jury; that Beatrice was thereby deprived of its right to a fair and unprejudiced investigation; and that the paucity of evidence at the trial convincingly demon-

strates that the indictment was returned because of prosecutorial compulsion rather than because of the force of the evidence. This court indicated at the oral argument that it would call up the grand jury transcript for its own in camera examination. Defense counsel since then have suggested that the same constitutional infirmities attach to appellate inspection as to district court review.

■ Grand jury proceedings, of course, have long enjoyed a character almost sacrosanct. "Grand jury testimony is ordinarily confidential". United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 233, 60 S.Ct. 811, 84 L.Ed. 1129. But the Supreme Court in that case also said, p. 234, 60 S.Ct. 849, that "after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." This is specifically recognized by Rule 6(e), F.R.Cr.P.

This "indispensible secrecy of grand jury proceedings", as Mr. Justice Frankfurter has typified it in United States v. Johnson, 1943, 319 U.S. 503, 513, 63 S.Ct. 1233, 1238, 87 L.Ed. 1546,

> "must not be broken except where there is a compelling necessity. There are instances when that need will outweigh the countervailing policy. But they must be shown with particularity". United States v. Procter & Gamble Co., 1958, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077.

And in Pittsburgh Plate Glass Co. v. United States, 1959, 360 U.S. 395, 396, 399–400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323, the Supreme Court has told us that, under Rule 6(e), inspection of the grand jury minutes has been committed "to the sound discretion of the trial judge"; that the defense does not have a "right" to grand jury minutes; and that instead it has the burden to show "a particularized need" which "outweighs the policy of secrecy".

No case precisely in point here has been cited to us. Most have applied the Pittsburgh Plate Glass standard to situations of alleged or suspected discrepancy between a witness' testimony at the trial and that before the grand jury. See, for example, Berry v. United States, 8 Cir., 1961, 295 F.2d 192, 194–195, cert. den. 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 388; Travis v. United States, 10 Cir., 1959, 269 F.2d 928, 945–946, reversed on other grounds 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340. General allegations usually have been frowned upon. United States v. Coduto, 7 Cir., 1960, 284 F.2d 464, 468, cert. den. 365 U.S. 881, 81 S.Ct. 1027, 6 L.Ed.2d 192; Ogden v. United States, 9 Cir., 1962, 303 F.2d 724, 741–742. In camera inspection by the trial court has been suggested, see Brilliant v. United States, 8 Cir., 1962, 297 F.2d 385, 391, cert. den. 369 U.S. 871, 82 S.Ct. 1140, 8 L.Ed.2d 275, and in some cases has been employed within limits and not disapproved. The Second Circuit seems to have gone so far as to require in camera inspection of at least a portion of the grand jury minutes whenever a suggestion has been made as to discrepancy. United States v. Hernandez, 1960, 282 F.2d 71; 1961, 290 F.2d 86, 88–89; United States v. Giampa, 1961, 290 F.2d 83, 85. Other courts, including our own, have recognized the drawbacks of routinely compelling trial judges to indulge in such inspection and have upheld, as a non-abused discretionary matter, a trial court's refusal to inspect the grand jury transcript. Pittsburgh Plate Glass Co. v. United States, 4 Cir., 1958, 260 F.2d 397, 404, affirmed, supra, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323; Berry v. United States, supra; Brilliant v. United States, supra; Hance v. United States, 8 Cir., 1962, 299 F.2d 389, 398; Banks v. United States, 8 Cir., 1953, 204 F.2d 666, 669–670, cert. granted and case remanded on other grounds, 348 U.S. 905, 75 S.Ct. 311, 99 L.Ed. 710; Travis v. United States, supra.

■ In the present case are a number of facts, each perhaps of no great significance when considered alone, which seem in the aggregate at least to afford a tone to this demand from the defense: (a) The motion was presented to the court more than two and one-half years

after the indictment was returned despite the fact that the affidavit alleged that the recorded statements were made immediately following the witnesses' appearance before the grand jury. We are not saying that the motion was untimely for it was made before trial as required by Rule 12(b) (2). (b) The supporting affidavit was that of counsel and was sworn to on the day of the trial. No supporting affidavit from any of the three witnesses was presented. (c) The witnesses in question were only three of many which appeared before the grand jury. (d) The witnesses were agents or employees of Roberts, one of the defendants under consideration. (e) The affidavit itself indicates that recorded statements were taken from other witnesses but it contains no similar reference to any of these. (f) One of the three witnesses testified at the trial.

Under these circumstances we cannot say that the defense has established a particularized need for the grand jury transcript. There is authority to the effect that a prosecutor, while before the grand jury, may not participate in its deliberations or express opinions on questions of fact or attempt to influence the finding. See, for example, United States v. Wells, D. Idaho, 1908, 163 F. 313, 325–326. But the courts generally have been most cautious in invalidating indictments for alleged grand jury misconduct of the prosecutor. See McKinney v. United States, 8 Cir., 1912, 199 F. 25, 28–29; United States v. Rintelen, S.D.N.Y., 1916, 235 F. 787, 794–795.

 Nor is it effective or significant to say that the attorney's affidavit stands alone and uncontradicted in the record. The burden is on the defense. The situation is not unlike that in Glasser v. United States, supra, where the Supreme Court said, p. 87 of 315 U.S., p. 472 of 65 S.Ct., "the formal affidavit alone, even though uncontroverted, is not enough".

 We recognize that this is a situation where the traditional reasons for grand jury secrecy (see, for example, United States v. Rose, 3 Cir., 1954, 215 F.2d 617, 628–629, 8 Wigmore, Evidence

(McNaughton Revision 1961), § 2360), may have little application. But there is a strong presumption of regularity accorded to the findings of a grand jury. United States v. Nunan, 2 Cir., 1956, 236 F.2d 576, 594, cert. den. 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665. The "ends of justice" are the guide. We do not see in the allegations of this affidavit anything which suggests that the ends of justice require that the whole or any part of this transcript be made available to the defendant. It follows that the trial court would not have abused its discretion had it refused to examine the grand jury minutes. It follows further that there can then be no error in the district court's inspection of the transcript in camera and in its subsequent denial of the defense motion, and that this does not constitute, as Beatrice suggests, a secret reception of evidence or a denial of due process or a deprival of the confrontation guaranty of the Sixth Amendment. It will afford the defense little comfort, perhaps, when we say, for what it is worth, that we, too, have carefully read the 1100 pages of the grand jury transcript. We find nothing in those proceedings which, in view of the antitrust character of this case, is prejudicially offensive to the ends of justice. On the basis of that inspection, also, we conclude that the trial court's denial of Beatrice's motion was not an abuse of discretion. The fact we have done so in this case is not to be taken as a precedent for thus burdening any court or as a holding on our part that a review of this kind is necessary or even indicated in all cases.

Compare, generally, on this point, Fitts v. Superior Court, 1935, 4 Cal.2d 514, 51 P.2d 66, 70–71, 102 A.L.R. 290; United States v. Greenberg, S.D.N.Y., 1962, 204 F.Supp. 400; United States v. Kahaner, S.D.N.Y., 1962, 204 F.Supp. 921.

3. *The sufficiency of the evidence.* Because of the importance of this issue and the emphasis given it by the defense, we review the evidence in detail. At the trial the government introduced a num-

ber of exhibits including compiled charts. This documentary material disclosed the following:

(a) The three years preceding April 1954. The Veterans Hospital opened in early 1951. For ten bid periods all three defendants submitted offers. Alamito received the Hospital contract four times, twice at no discount from the wholesale list price, once at 3%, and once at 10½%; Beatrice obtained the contract four times, once at 1% discount, once at 4½%, and twice at 5%; and Roberts received the contract twice, once at 1% discount and once at 2%. On one occasion Beatrice offered a bid of 7½% discount but was outbid by Alamito. For the eight bid periods at the Air Force Base, Alamito received the contract twice with no discounts, Roberts received it twice at zero and 3.96%, respectively, and Beatrice received it four times, twice at 2%, once at 3½%, and once at 5%.

(b) April 1954 to early 1957. During this period all contracts for both the Hospital and the Base were awarded at a flat 2% discount, with one exception at the Hospital when an alternate of 1½% discount for six months, rather than 2% for twelve months, was accepted. Each of the defendants won contracts at this level. Roberts was always the successful bidder at the Hospital during eight consecutive bid periods, with Alamito and Beatrice either not bidding or bidding at zero or 1% discount. At the Base Alamito and Beatrice were alternately successful at 2%; Roberts consistently submitted a bid at no discount; Beatrice and Alamito, when losing the Base contract, did so on bids ranging from zero to 1½%.

(c) The period after early 1957. At the Hospital Alamito obtained the business at 2½% discount for the period beginning July 1, 1957; on July 1, 1958, Beatrice gained it at 5%; on October 1, 1958, Roberts acquired it at 10%. At the Base, for the six month period beginning June 1, 1957, Roberts obtained the contract for milk in gallons at about 8% discount; for the six month period beginning December 1, 1957, Beatrice gain-

ed the gallon contract at about 4%; and for the next succeeding period both Beatrice and Alamito submitted gallon bids at about 5% discount.

The government's case also included the following: (a) Evidence as to the bids submitted by the three defendants and others to the University of Nebraska Hospital and to the Creighton Memorial St. Joseph's Hospital, both in Omaha, during the period of the alleged conspiracy. This showed variations in bidding by the three defendants and offers of discounts from zero up to 15%. (b) Testimony of Lewis Klesath, former manager of Beatrice's Council Bluffs plant, to the effect that in 1956, during the indictment period, he received calls from officials of Roberts and Alamito a week or so in advance of contemplated changes in wholesale list prices in the area and that he discussed those price changes and their effective dates with them. Area prices, of course, were the base points from which bid discounts were measured.

■■■■■ It is axiomatic by now that on an appeal from a conviction it is not for us to weigh the evidence "but only to consider whether the evidence in its most favorable aspect to the Government is legally capable of allowing a jury to become persuaded of guilt". Phelps v. United States, 8 Cir., 1947, 160 F.2d 858, 868, cert. den. sub nom. Peters v. United States, 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780; Glasser v. United States, supra, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Blauner v. United States, 8 Cir., 1961, 293 F.2d 723, 725, cert. den. 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 193; Isaacs v. United States, 8 Cir., 1962, 301 F.2d 706, 727, cert. den. 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58. Participation in a criminal conspiracy may be shown by circumstantial evidence as well as by direct evidence. Delli Paoli v. United States, 1957, 352 U.S. 232, 236, footnote 4, 77 S.Ct. 294, 1 L.Ed.2d 278; Blumenthal v. United States, 1947, 332 U.S. 539, 557, 68 S.Ct. 248, 92 L.Ed. 154; Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674. Of

course, declarations of a conspirator are admissible over the objections of an alleged co-conspirator who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy. Glasser v. United States, supra, p. 74 of 315 U.S., p. 467 of 62 S. Ct.; Tingle v. United States, 8 Cir., 1930, 38 F.2d 573, 575.

The government emphasizes and argues (a) that during the three years preceding the indictment period each of the three defendants had some share of the fluid milk business at both the Base and the Hospital; (b) that vigorous competition had been present during that period with resulting bids varying from zero up to 10% discount and with the last accepted bids at both the Base and the Hospital at 5% and both possessed by Beatrice; (c) that about March 1954 a dramatic and complete change in the bid pattern took place and genuine competition came to an end; (d) that at the Hospital Beatrice did not renew its immediately preceding successful 5% bid and, with one exception, never offered any discount there; (e) that Alamito offered no discount to the Hospital although, before, it had submitted discount offers up to 10½%; (f) that Roberts received the Hospital business exclusively for the three and one-quarter year period at a uniform 2% discount; (g) that this was in contrast with Roberts' intermittent success in the preceding three years; (h) that Alamito, being a "small business", could have obtained any contract with only an equal bid but did not submit such a bid; (i) that at the Base Roberts did not reoffer its previously successful 3.96% bid and offered no discount at all; (j) that Beatrice did not repeat its last successful 5% bid there; (k) that Alamito and Beatrice got the Base business at a uniform 2% discount; (l) that it came to them in almost perfect rotation; (m) that the 2% discount at the Base was the first ever offered there by Alamito; (n) that after the indictment period there was a sudden reversion to the original competitive practices as illus-

trated by Roberts' submitting bids at the Base ranging from zero to 8%, by Beatrice's getting the gallon contract there for one period at 4%, by 5% bids being offered by both Alamito and Beatrice for the succeeding period, and by successful bids by Alamito, Beatrice and Roberts, respectively at 2½%, 5%, and 10%, all in contrast to the uniform 2% prevailing theretofore; and (o) this this documentary proof is buttressed by the Klesath testimony and by the differing practices at the two Omaha community hospitals.

The government further argues that for the last bid period before the indictment period the Base volume was about twice that of the Hospital; that, with Beatrice and Alamito sharing the Base equally and with Roberts having the Hospital exclusively, the total business was thus divided equally three ways; that the bid pattern at the Base and the Hospital at a uniform winning figure of 2% was obviously unnatural as shown by the contrasting pattern at the University and Creighton hospitals in which the defendants participated; that the record contained no evidence of a "moral call of community charities for favorable prices", as Beatrice would typify it, with respect to the two latter hospitals which would account for the bid pattern differences; that there was widely disparate bidding at the Base and at the Hospital, both before and after the indictment period; and that it follows that there was concerted action to fix prices at the two government institutions during the period in question and to allocate the business there among the three dairies.

Beatrice argues (a) that there is direct evidence against the existence of any conspiracy; (b) that there was no Alamito witness adverse to Beatrice but only one who said he did not know what the other dairies were going to do; (c) that there was no Roberts witness adverse to Beatrice for the Roberts witness testified that her company determined its bids without consultation with Beatrice; (d) that the Alamito and Roberts witnesses denied the existence of the conspiracy

and, inasmuch as they were called by the prosecution, the government is bound by their testimony; (e) that the Hospital purchasing department witness admitted that, so far as he knew, Beatrice had to do only with its own bids; (f) that the only direct evidence against Beatrice was inadmissible hearsay; (g) that Roberts' refusal to offer a discount at the Base from March 1954 on arose out of its dispute with the Air Force over the latter's taking unwarranted discounts for late cash payments; (h) that Roberts did continue to bid discounts at the Hospital; (i) that Roberts never had bid more than 2%, the 3.96% for one period at the Base being 2% plus a 2% cash prompt payment discount thereon; (j) that it was the uniformity of price which the defendants had to pay for raw milk, as required by a federal milk marketing order, which laid the foundation for identical wholesale prices in the area; (k) that the 2% discount figure was not new in 1954 but had appeared in 1952 and 1953 and captured the business; (l) that bids were publicly opened and each bidder therefore knew what the others had offered at preceding bid periods; (m) that Alamito, in contrast to Roberts and Beatrice, needed only to meet the bids of the others in order to get the business; (n) that the total dollar volume of the Base and the Hospital from January 1954 to April 1957 was not divided equally among the three defendants but went 37.7% to Beatrice, 19.8% to Roberts, 40.1% to Alamito and 2.4% to another dairy;[4] (o) that evidence of the bidding transactions with the University and Creighton hospitals has no significance because it was not demonstrated that they presented comparable situations as to cost elements and the like, because there was advertising value in being the official dairy at a well-patronized general hospital, and because there was a duty to provide favorable prices to community charities; (p) that

there was no proof that the bids at the Base and the Hospital were not independently prepared or were not the product of independent judgments of different businessmen; (q) that the bids reflected good business judgments independently arrived at; (r) that the Klesath testimony was immaterial and, in any event, established nothing more than exchanges of information about the Omaha market generally; (s) that the government concedes the absence of a conspiracy before 1954 and yet there are instances of identical bids by all three defendants during that earlier time; (t) that the post-conspiracy period reflects similar instances and yet the government concedes no conspiracy then existed; (u) that the trial degenerated into a mass of extraneous evidence; (v) that the facts are as consistent with innocence as with guilt; and (w) that the government totally failed to prove the crime charged.

In passing upon this issue of the sufficiency of the evidence, we have in mind that the conspiracy charged here actually is very confined. It concerns only fluid milk. It concerns only the Veterans Hospital and the Offutt Air Force Base. And it concerns only the period from 1954 to April 1957. Other outlets in the area and other products are not embraced in the charge.

We recognize, too, that fluid milk is a highly standardized commodity which provides little room, if any exists at all, for quality differences or for special or advantageous purchases of the raw product from suppliers and which, because of uniform labor contracts, encounters processing costs of rigid consistency. This court noted these very factors in Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 367–369, cert. den. 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358, and observed there that

"We are clear that mere uniformity of prices in the sale of a standard-

4. The government replies that these figures find no support in the record and that any percentage for the non-defendant dairy is attributable to cottage cheese, a com-

modity not specified in the indictment and not included in the compilation of the government's opposing figures.

ized commodity such as milk is not in itself evidence of a violation of the Sherman Anti-Trust Act".

These stubborn facts of the milk business, by their very existence, present difficulties in the prosecution of an antitrust case against commercial dairies. But of course they do not constitute an insuperable obstacle to the successful prosecution of such a case.

██ After carefully reviewing all the evidence and the entire transcript here we have concluded that, although some might regard the case as not a strong one, Beatrice was nevertheless not entitled to a judgment of acquittal. Beatrice chose to stand on its motion for that judgment and offered nothing in opposition or in explanation of the evidence presented by the government. We cannot say that that evidence, wholly apart from the Vavra and Anderson testimony which is mentioned below, was not sufficient to sustain the jury's verdict or that it was so affirmatively adverse as to necessitate an acquittal. The bid patterns at the Base and Hospital for the pre-conspiracy and post-conspiracy periods contrast vividly with that prevailing during the indictment period. The disparity in the bids at each institution before and after; the 2% uniformity of the sucessful bids at both institutions during the period; the indicated approximately equal division of the aggregate business among the three defendants; the almost even rotation, timewise, of the Base business between Beatrice and Alamito; the absence of tie bids by Alamito; the contrast with the simultaneously existing bid patterns at Creighton and the University, and the Klesath testimony manifestly present, upon the standards enunciated by the authorities cited above, an adequate basis for valid inferences of the collusion statutorily forbidden. Of course, there are arguments which can be made to the contrary. But we are persuaded that those arguments are properly for the jury and do not compel the acquittal which Beatrice demands here as a matter of law. That those arguments did not convince the jury is not anything with which we may presently deal, even though, had the case been tried to us in the first instance, it might have been possible for us to decide the issue otherwise.

The defense strenuously urges that there is an utter absence of any direct and independent evidence of collaboration between the alleged conspirators. It is true that Alamito's wholesale manager testified that he did not know what anyone else's bid figures were going to be, that Roberts' treasurer testified that her company did not obtain the approval of Beatrice before they put into effect their price bulletins designed for intraplant use, and that representatives of the Base and Hospital each testified that so far as he knew Beatrice had nothing to do with the preparation of any bid except its own. But this overlooks, we feel, the bid pattern at the Base and the Hospital and also the Klesath testimony. Although the Klesath conversations had to do with matters affecting the area generally and were not directed specifically to business at the Base and the Hospital, the pricing at the latter was dependent on the former. All this, it seems to us, is basic evidence from which the inferences which the jury necessarily drew could properly follow.

Beatrice, however, cites as controlling authority United States v. Borden Co., N.D.Ill., 1953, 111 F.Supp. 562, reversed as to the Clayton Act issue but affirmed as to the Sherman Act issue, 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903, and Pevely Dairy Co. v. United States, supra, 8 Cir., 1949, 178 F.2d 363.

Borden was a civil suit brought by the United States. Ten defendant dairies were charged with conspiracy to restrain and monopolize interstate commerce in the sale of fluid milk to wholesale customers in the Chicago area, in violation of the Sherman Act, and with price discrimination, in violation of the Clayton Act. Injunctive and other relief was sought. Five defendants negotiated a consent decree. At the conclusion of the government's case the five remaining de-

fendants each moved to dismiss. The court initially observed that conspiracies of the kind described in the complaint "are difficult to prove, and most often can be proved only through the use of evidence which is circumstantial and seemingly remote"; that the testimony of solicitors of the defendants and of wholesale customers served by the defendants revealed "glaring inconsistencies" and cumulatively failed "to reveal any consistent pattern of business conduct among the defendants"; and that the testimony did reveal a "continuous shuffling of customers" which was "not consonant with the existence of a monopolized market". The court reviewed other oral and documentary evidence and indicated that it was "more impressed with what the documents fail to show rather than that which the documents show". The government introduced exhibits which were tabulations of bids made by the dairies for institutional customers. These showed that particular defendants repeatedly submitted low bids to particular institutions and that certain defendants were alternately successful in bidding for the business of certain institutions. The court refused to draw from these charts the inferences of collusion for which the government argued but concluded instead that the exhibits showed no more than "a disposition on the part of certain defendants to bid for the milk requirements of particular public institutions". It went on to observe that there was no direct evidence of an agreement or understanding among the defendants or of intercorporate communication; that reasonable businessmen will act similarly when facing a like problem; that every major dairy in the area had been presented with the same problem, namely, the advent of a new competitor, and that similar action directed toward this problem did not enable the court to infer a concert of action. It held that the government must present independent evidence to prove that the defendants were participants in a plan. The dismissal of that part of the complaint which charged Sherman Act violations was therefore granted. As we have noted above, this phase of the trial court's decision was affirmed by the Supreme Court, pp. 516–517 of 347 U.S., p. 705 of 74 S.Ct. The remainder of the case continues in litigation. See United States v. Borden Co., 1962, 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed.2d 627.

In Pevely the two defendant dairies were convicted by a jury of a conspiracy to fix wholesale and retail prices on milk in the St. Louis area in violation of the Sherman Act. Six individual defendants who were officers or employees of the corporate defendants were acquitted. One of the issues raised by the defense was that the evidence was insufficient to sustain the conviction. This court, in ruling on the issue, observed that the evidence was wholly circumstantial and undisputed. It noted that raw milk prices were fixed by government regulation; that milk quality was prescribed by local ordinance; that labor costs were substantially the same for each defendant; that the processed product the defendants handled was a standardized product; that the circumstantial evidence consisted of the uniformity of prices charged and the proximity in time of price changes; that proved conversations between employees of the defendants concerning price announcements occurred only some seven years before the filing of the indictment; that prices were thoroughly analyzed by management upon the basis of economic factors; that the evidence showed that those factors were the only considerations influencing the price changes; that the pricing system was in accord with one established by an international association; that economic principles must be recognized by the courts; that mere uniformity of prices in the sale of a standardized commodity such as milk is not in itself evidence of a violation of the Sherman Act; that the price changes were not simultaneous and were not uniformly initiated by the same defendant; that the same economic factors

applied to each defendant; that the evidence was undisputed that officials of the defendant dairies made no agreement with respect to the fixing of prices; that the acquittal of the individual officials weakened the presumption of correctness usually attributable to the verdict of a jury; that the circumstances were not inconsistent with innocence; and that the motions of the defendants for acquittal should have been sustained. Judge Thomas dissented on this issue.

Borden and Pevely do lend some support and argumentative material to the position of Beatrice here. We feel, however, that neither compels a conclusion that the evidence in the present case was insufficient to support a jury verdict. In so holding we do not in any way impinge upon the authority of either Pevely or Borden. Both cases were concerned with conspiracies alleged to exist with respect to broad metropolitan areas. Here only two institutions are involved. Borden presented instances of what the court chose to describe as "glaring inconsistencies in the testimony"; there was an absence of evidence of a pattern of business conduct; and there was continuous shuffling of customers. In Pevely the government's evidence was wholly circumstantial; there was evidence of absence of agreement; no inter-corporate conversation within seven years was shown; and there was proof that prices were determined by each dairy acting independently upon its own analysis of economic factors. In both Borden and Pevely testimony was presented by the defense which served to destroy the inferences the government urged. In the case before us Beatrice has made no record, there is at least some direct evidence supporting the circumstantial, and there were bid patterns of definite outline. The prosecution's case rises above those presented in Borden and Pevely.

In cases of this kind direct testimony of unlawful agreement is usually not available and the prosecution is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators. Here, as we have noted, there is some supporting testimony of direct character. In any event, we regard as pertinent the following language of the Supreme Court in Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 225–226, 59 S.Ct. 467, 474, 83 L.Ed. 610:

> "Taken together, the circumstances of the case which we have mentioned, when uncontradicted and with no more explanation than the record affords, justify the inference that the distributors acted in concert and in common agreement * * *. When the proof supported, as we think it did, the inference of such concert, the burden rested on appellants of going forward with the evidence to explain away or contradict it."

That Court has also said, with respect to criminal cases, "Once the Government has established its case, the defendant remains quiet at his peril". Holland v. United States, 1954, 348 U.S. 121, 138–139, 75 S.Ct. 127, 137, 99 L.Ed. 150.

4. *Errors in the reception of evidence.* This is directed to the trial court's admission into evidence of the bids of Roberts and Alamito and of the testimony of government witnesses Vavra and Anderson.

■ The bid evidence is attacked on the ground that a conspiracy cannot be proved by declarations of alleged co-conspirators made outside the presence of the defendant. We feel, however, that Beatrice's own bids are facts which are pertinent to the issue here. It is true that the bids of Alamito and Roberts were necessary to show their participation in the alleged conspiracy; when viewed alone, however, those bids could not implicate Beatrice. It is the bidding pattern of all three which evidences the conspiracy and the bids of all three constituted conduct rather than declarations.

■ Vavra was a driver formerly employed by Alamito. He testified that in May 1955 he started working parttime for that dairy; that he ran its route

to the Base; that in November of that year he talked with McCarty, the Alamito plant manager; that he asked McCarty what he was to do when the route was over and if he would still be employed; that McCarty said, " * * * no, but that I would probably be back in six months; that Alamito would have the route out there again"; that McCarty told him he "would probably be working every six months * * * it was the policy of the two companies, Meadow Gold [Beatrice] and Alamito, that one would have it for six months and then the other one"; that he was reemployed when Alamito received the contract again in June 1956; and that McCarty had died by the time of the trial.

Beatrice's objection to the Vavra testimony is that it was inadmissible in the absence of independent proof of the claimed conspiracy. Because we feel that independent proof of the conspiracy was present, we necessarily conclude that the district court did not err in admitting this testimony.

Major Anderson was procurement officer at the Base from 1955 to 1958. He testified that he had a conversation in his office with his clerk, Phyllis Orth, on May 8, 1956, when bids were to be opened; that Mrs. Orth said, "I wonder whose turn it is today"; that in response to his inquiry she further said, "Well those bids are rotated among the firms"; and that she said that she based that comment on "past observations of bid openings in this office". The district court, on its own motion, struck that testimony and directed the jury to disregard it because it was self-serving and not binding on Beatrice.

The Major then testified that he was present at the opening of bids on that day; that he observed the bids were identical on most fluid milk items; that he announced that they were identical; that it was stated by those present that the discounts would vary at different times; that he then said,

"Do you mean to tell me that your costs of the various firms are iden-

tical on all or a majority of these items down to a fraction of a cent even though some of you may have efficient personnel and equipment and some of you may have less efficient personnel and equipment?";

and that they replied in the affirmative. In response to an immediate inquiry by the court, Anderson conceded that he had no way of disputing this because he had never been in the milk business.

Beatrice objected to the Anderson testimony on the ground that it was hearsay and not binding on Beatrice. It argues that the witness would not have been permitted to testify directly that the uniform bids were the result of an illegal price-fixing conspiracy and that he should not be allowed to do the same thing indirectly.

 Clearly the Orth-Anderson conversation can be of no significance on this appeal. With the proof aliunde in this record we must accept the premise that the jury obeyed the court's instructions to disregard this testimony. We view the situation as one where the instruction has cured the error and not as one of the kind where its withdrawal cannot remove a harmful effect it caused. Compare Dolan v. United States, 8 Cir., 1955, 218 F.2d 454, 460, cert. den. 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255; Wiley v. United States, 8 Cir., 1958, 257 F.2d 900, 905–906; Kotteakos v. United States, 1946, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557; Delli Paoli v. United States, supra, p. 242 of 352 U.S., p. 300 of 77 S.Ct.

 Although we have doubt as to the admissibility of the other Anderson testimony, we are not convinced that, if its admission was error, there was resulting prejudice. Anderson's comment was one which a jury would regard as a natural reaction for a procurement officer and we agree that whatever seeming significance it might initially have had was dulled and dissipated by the trial court's own rebuke and limiting question. On this record we hold its admission to have

been harmless error within the standard of Rule 52(a), F.R.Cr.P.

5. *Errors in the instructions.* Beatrice's points here are (a) that the trial court by its instructions in effect amended the indictment by several times describing the charge against the defendants as one to fix uniform prices in the general Omaha area and (b) that the court's thrice-repeated emphasis to the jury that it should consider the evidence as a whole was prejudicially misleading and confusing. Appropriate exceptions were made.

We have read the instructions in their entirety and with great care. It is seldom that counsel in a complicated criminal case can be satisfied with every phrase of the court's charge to the jury. It is seldom, too, that an appellate court or, for that matter, a trial court reviewing his own instructions already delivered cannot find ways in which those instructions could have been improved.

 It would serve little purpose for us to set forth in this already lengthy opinion the details of the charge which the defense attacks here. It will suffice to say that the trial court did make references to the "Omaha area" and did speak of conspiring to maintain uniform and noncompetitive prices on dairy products in that area. We feel, however, that the charge is neither fatally defective nor unfair. It seems clear to us (and, as to this, we have considered the government's closing arguments and the fact of the jury's request, not acted upon by the court because the verdict was returned in the interim, for a copy of the text of the Sherman Act) that the jury did not assume or understand that Beatrice was charged with anything other than a conspiracy directed solely to the Base and the Hospital or, to express it reversely, that it understood Beatrice was not charged with a conspiracy to

fix uniform prices generally in the Omaha market. We are persuaded as to this by the court's and counsels' repeated emphasis upon the Base and the Hospital as the objects of the conspiracy. Also, the indictment was read to the jury and was specific in its confining aspects. The evidence itself was overwhelmingly directed to the two institutions. Area reference was not improper in itself for the bids, in terms of discounts from wholesale list prices, were of significance only in relation to the prices prevailing in the Omaha market. It is often the case that a court might properly have given instructions requested by the defense but we cannot say that the instructions here did not adequately present the issues in a form understandable to the jury. The situation is far different from those involved in Stirone v. United States, 1960, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252, and Bollenbach v. United States, 1946, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350, and other cases suggested by the defense.

 Beatrice's argument as to undue emphasis upon the evidence as a whole also fails to persuade us. It is true that the jury was told three separate times during the course of the instructions to consider the evidence as a whole. But it was also told, and at least three separate times, that the conspiracy had to be established by evidence independent of the declarations of co-conspirators. Here, too, we are not willing to assume on this record that the jury did not heed the cautionary portion of this charge or was prejudicially confused. "Our theory of trial relies upon the ability of a jury to follow instructions". Opper v. United States, 1954, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101.

Affirmed.