UNITED STATES *v.* BORDEN COMPANY ET AL.

No. 439.   Argued April 24–25, 1962.—Decided June 25, 1962.

*Richard A. Solomon* argued the cause for the United States.   With him on the briefs were *Solicitor General Cox, Assistant Attorney General Loevinger* and *Elliott H. Moyer.*

*Stuart S. Ball* argued the cause for The Borden Company, appellee.   With him on the briefs was *H. Blair White.*

*John Paul Stevens* argued the cause for Bowman Dairy Company, appellee.   With him on the briefs was *L. Edward Hart.*

Mr. Justice Clark delivered the opinion of the Court.

This is a direct appeal [1] from a judgment dismissing the Government's Section 2 (a) Clayton Act [2] suit in which it sought an injunction against the selling of fluid milk products by the appellees, The Borden Company and Bowman Dairy Company, at prices which discriminate between independently owned grocery stores and grocery store chains. The District Court in an unreported decision found the pricing plan of each dairy to be a prima facie violation of § 2 (a) but concluded that these discriminatory prices were legalized by the cost justification proviso of § 2 (a), which permits price differentials as long as they "make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered." To review the Government's contention that the District Court had improperly permitted cost justifications based on the *average* cost of dealing with broad groups of customers unrelated in

---

[1] Jurisdiction is conferred under § 2 of the Expediting Act of February 11, 1903, 32 Stat. 823, as amended, 15 U. S. C. § 29.

[2] "Sec. 2. (a) That it shall be unlawful for any person engaged in commerce, in the course of such commerce, . . . to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . ." 38 Stat. 730, as amended, 49 Stat. 1526, 15 U. S. C. § 13 (a).

cost-saving factors,[3] we noted probable jurisdiction, 368 U. S. 924, and directed the parties to brief and argue the case separately as to each appellee, 368 U. S. 963. However, finding the same problem at the root of the cost justifications of each appellee, we have dealt with both in this single opinion. We have concluded that the class cost justifications submitted to the District Court by the appellees did not satisfy their burden of showing that their respective discriminatory pricing plans reflected only a "due allowance" for cost differences.

By way of background, we first point out that the present appeal is merely a glimpse of protracted litigation between the parties which began in 1951 and which has not yet seen its end. The original complaint charged violations of §§ 1 and 2 of the Sherman Act and § 2 (a) of the Clayton Act. The District Court dismissed the suit, holding that there was no proof of the alleged Sherman Act violations and that no equitable relief was necessary under the Clayton Act charge because appellees were already restrained by a consent decree entered in a private antitrust case. 111 F. Supp. 562. On direct appeal we affirmed the dismissal of the Sherman Act charges but held erroneous the refusal to grant an injunction on the Clayton Act claim solely because of the existence of the private decree. 347 U. S. 514. On remand the case was reopened and on its prima facie case the Government introduced recent general price schedules and illustrated their effect on sample stores to show that each appellee was still engaged in illegal price discrimina-

---

[3] Bowman's contention that the Government by stipulation limited itself to specific objections which do not include the present one is without foundation in the record. At the time the stipulation was proposed, the trial court made it quite clear that the Government by so stipulating was not waiving its right to argue the legal sufficiency of the proffered cost studies.

tions notwithstanding the consent decree. In defense the appellees each introduced voluminous cost studies in justification of their pricing systems. The entire case was submitted via stipulations, depositions, and briefs. There was no dispute as to the existence of price discrimination; the sole question was whether the differences in price reflected permissible allowances for variances in cost.

In view of our disposition, we need not relate the facts in detail. Both appellees are major distributors of fluid milk products in metropolitan Chicago. The sales of both dairies to retail stores during the period in question were handled under plans which gave most of their customers—the independently owned stores—percentage discounts off list price which increased with the volume of their purchases to a specified maximum while granting a few customers—the grocery store chains—a flat discount without reference to volume and substantially greater than the maximum discount available under the volume plan offered independent stores. These discounts were made effective through schedules which appeared to cover all stores; however, the schedules were modified by private letters to the grocery chains confirming their higher discounts.[4] Although the two sets of discounts were never

---

[4] Borden in June of 1954 issued the following discount schedule to "be applied to all purchases of Borden's fresh milk":

| Average converted units per day: | Percent of discounts |
|---|---|
| 0– 24 | 0 |
| 25– 74 | 2 |
| 75–149 | 3 |
| 150 and over | 4 |

At this same time, letters were sent to The Great Atlantic and Pacific Tea Company and The Jewel Food Stores granting them flat 8½% discounts. A few of the larger independents by special arrangement were given an additional 1½% discount, thereby raising their total discount to 5½%. [Footnote 4 continued on p. 464]

officially labeled "independent" and "chain" prices, they were treated, called, and regarded as such throughout the record.

To support their defense that the disparities in price between independents and chains were attributable to differences in the cost of dealing with the two types of

---

In September 1955, Borden discontinued the above discount system and utilized a net price scheme which resulted in even greater disparities between chains and independents.

Bowman in June of 1954 operated under the following "Resale Store Discount Schedule":

| Average converted points per day: | Percent of discounts |
|---|---|
| 0 to 10 | 3.0 to 3.4 |
| 10 to 20 | 3.4 to 3.8 |
| 20 to 30 | 3.8 to 4.2 |
| 30 to 40 | 4.2 to 4.6 |
| 40 to 50 | 4.6 to 5.0 |
| 50 to 60 | 5.0 to 5.2 |
| 60 to 70 | 5.2 to 5.4 |
| 70 to 80 | 5.4 to 5.6 |
| 80 to 90 | 5.6 to 5.8 |
| 90 to 100 | 5.8 to 6.0 |
| 100 to 110 | 6.0 to 6.2 |
| 110 to 120 | 6.2 to 6.4 |
| 120 to 130 | 6.4 to 6.6 |
| 130 to 140 | 6.6 to 6.8 |
| 140 to 150 | 6.8 to 7.0 |

This schedule was modified in August by the addition of the following discounts:

| Average converted points per day: | Percent of discounts |
|---|---|
| 150 to 200 | 7.0 to 8.0 |
| Over 200 | 8.0 |

During this same period Bowman by letter granted The Great Atlantic and Pacific Tea Company and The Kroger Company flat 11% discounts. Goldblatt Bros., also a multi-store operation, was granted a flat 8½%.

In 1955 and again in 1956 Bowman modified the brackets and percentages of its discount schedules, but not in a manner which reduced the disparity between independents and chains.

customers, the appellees introduced cost studies which will be described separately because of their differing content and analytical approach.

The Borden pricing system produced two classes of customers. The two chains, A & P and Jewel, with their combined total of 254 stores constituted one class. The 1,322 independent stores, grouped in four brackets based on the volume of their purchases, made up the other. Borden's cost justification was built on comparisons of its average cost per $100 of sales to the chains in relation to the average cost of similar sales to each of the four groups of independents. The costs considered were personnel (including routemen, clerical and sales employees), truck expenses, and losses on bad debts and returned milk. Various methods of cost allocation were utilized: Drivers' time spent at each store was charged directly to that store; certain clerical expenses were allocated between the two general classes; costs not susceptible of either of the foregoing were charged to the various stores on a per stop, per store, or volume basis.

Bowman's cost justification was based on differences in volume and methods of delivery. It relied heavily upon a study of the cost per minute of its routemen's time. It determined that substantial portions of this time were devoted to three operations, none of which were ever performed for the 163 stores operated by its two major chain customers.[5] These added work steps arose from the method of collection, i. e., cash on delivery and the delayed collections connected therewith, and the performance of "optional customer services." The customer services, performed with varying frequency depending upon the circumstances, included "services that the driver may be requested to do, such as deliver the order inside, place the containers in a refrigerator, rearrange

---

[5] The third chain, Goldblatt Bros., also did not take these services.

containers so that any product remaining unsold from yesterday will be sold first today, leave cases of products at different spots in the store, etc." The experts conducting the study calculated as to these elements a "standard" cost per unit of product delivered: the aggregate time required to perform the services, as determined by sample time studies, was divided by the total number of units of product delivered. In essence, the Bowman justification was merely a comparison of the cost of these services in relation to the disparity between the chain and independent prices. Although it was shown that the five sample independents in the Government's prima facie case received the added services,[6] it was not shown or found that all 2,500 independents supplied by Bowman partook of them. On the basis of its studies Bowman estimated that about two-thirds of the independent stores received the "optional customer services" on a daily basis and that "most store customers pay the driver in cash daily."

On these facts, stated here in rather summary fashion, the trial court held that appellees had met the requirements of the proviso of § 2 (a) on the theory that the general cost differences between chain stores as a class and independents as a class justified the disparities in price reflected in appellees' schedules. In so doing the trial court itself found "the studies . . . imperfect in

---

[6] The contention is made that the Government limited its prima facie case to a few stores on some routes and that therefore cost justification was only necessary as to them. This overlooks the fact that sampling has long been a recognized technique in price discrimination cases and that this offering was in support of the Government's position, found valid by the trial court, that the entire Chicago pricing scheme of each appellee, as evidenced by its published price lists, was in violation of § 2 (a). In addition, appellee's cost justifications were not limited to the Government's sample stores.

some respects . . . ." It noted the "seemingly arbitrary" nature of a classification resulting "in percentage discounts which do not bear a direct ratio to differences in volume of sales." But it found "this mode of classification is *not* wholly arbitrary—after all, most chain stores do purchase larger volumes of milk than do most independent stores." [7] We believe it was erroneous for the trial court to permit cost justifications based upon such classifications.

The burden, of course, was upon the appellees to prove that the illegal price discrimination, which the Government claimed and the trial court found present, was immunized by the cost justification proviso of § 2 (a). Such is the mandate of § 2 (b) as interpreted by this Court in *Federal Trade Comm'n* v. *Morton Salt Co.*, 334 U. S. 37, 44–45 (1948).[8] There can be no doubt that the § 2 (a) proviso as amended by the Robinson-Patman Act contemplates, both in express wording and legislative history, a showing of actual cost differences resulting from the differing methods or quantities in which the commodities in question are sold or delivered.[9] The only

---

[7] Even the trial court was unwilling to give its "stamp of approval to all pricing policies and practices revealed by the evidence." But it concluded that to enjoin such practices would lead to regulation and would require the court continually "to pass judgment on the pricing practices of these defendants," a matter which might better be handled by proceedings before the Federal Trade Commission.

[8] Sec. 2 (b). "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section . . . ." 49 Stat. 1526, 15 U. S. C. § 13 (b).

[9] For a collection and discussion of the pertinent legislative history as well as the cases and treatises on the § 2 (a) proviso, see Rowe, Price Discrimination Under the Robinson-Patman Act, c. 10 (1962).

question before us is how accurate this showing must be in relation to each particular purchaser.

Although the language of the proviso, with some support in the legislative history,[10] is literally susceptible of a construction which would require any discrepancy in price between any two purchasers to be individually justified, the proviso has not been so construed by those charged with its enforcement. The Government candidly recognizes in its briefs filed in the instant case that "[a]s a matter of practical necessity . . . when a seller deals with a very large number of customers, he cannot be required to establish different cost-reflecting prices for each customer." In this same vein, the practice of grouping customers for pricing purposes has long had the approval of the Federal Trade Commission.[11] We ourselves have noted the "elusiveness of cost data" in a Robinson-Patman Act proceeding. *Automatic Canteen Co. v. Federal Trade Comm'n,* 346 U. S. 61, 68 (1953). In short, to completely renounce class pricing as justified by class accounting would be to eliminate in practical effect the cost justification proviso as to sellers having a large number of purchasers, thereby preventing such sellers from passing on economies to their customers. It seems hardly necessary to say that such a result is at war with Congress' language and purpose.

But this is not to say that price differentials can be justified on the basis of arbitrary classifications or even

---

[10] For instance, the Chairman of the Conference on the Bill reported to the House: "The differential granted a particular customer must be traceable to some difference between him and other particular customers, either in the quantities purchased by them or in the methods by which they are purchased or their delivery taken." 80 Cong. Rec. 9417 (1936).

[11] For a discussion of the Commission's position in this regard, see Rowe, *op. cit., supra,* note 9, § 10.6.

classifications which are representative of a numerical majority of the individual members. At some point practical considerations shade into a circumvention of the proviso. A balance is struck by the use of classes for cost justification which are composed of members of such selfsameness as to make the averaging of the cost of dealing with the group a valid and reasonable indicium of the cost of dealing with any specific group member.[12] High on the list of "musts" in the use of the average cost of customer groupings under the proviso of § 2 (a) is a close resemblance of the individual members of each group on the essential point or points which determine the costs considered.

In this regard we do not find the classifications submitted by the appellees to have been shown to be of sufficient homogeneity. Certainly, the cost factors considered were not necessarily encompassed within the manner in which a customer is owned. Turning first to Borden's justification, we note that it not only failed to show that the economies relied upon were isolated within the favored class but affirmatively revealed that members of the classes utilized were substantially unlike in the cost saving aspects considered. For instance, the favorable cost comparisons between the chains and the larger independents were for the greater part controlled by the higher average volume of the chain stores in comparison to the average volume of the 80-member class to which these independents were relegated. The District Court allowed this manner of justification because "most chain stores do purchase larger volumes of milk than do most independent stores." However, such a grouping for cost justification purposes, composed as it is of some independents

---

[12] Advisory Committee on Cost Justification, Report to the United States Federal Trade Commission (1956), p. 8.

having volumes comparable to, and in some cases larger than, that of the chain stores, created artificial disparities between the larger independents and the chain stores. It is like averaging one horse and one rabbit. As the Federal Trade Commission said in *In the Matter of Champion Spark Plug Co., 50 F. T. C. 30, 43* (1953): "A cost justification based on the difference between an estimated average cost of selling to one or two large customers and an average cost of selling to all other customers cannot be accepted as a defense to a charge of price discrimination." This volume gap between the larger independents and the chain stores was further widened by grouping together the two chains, thereby raising the average volume of the stores of the smaller of the two chains in relation to the larger independents. Nor is the vice in the Borden class justification solely in the paper volumes relied upon, for it attributed to many independents cost factors which were not true indicia of the cost of dealing with those particular consumers. To illustrate, each independent was assigned a portion of the total expenses involved in daily cash collections, although it was not shown that all independents paid cash and in fact Borden admitted only that a "large majority" did so.

Likewise the details of Bowman's cost study show a failure in classification. Only one additional point need be made. Its justification emphasized its costs for "optional customer service" and daily cash collection with the resulting "delay to collect." As shown by its study these elements were crucial to Bowman's cost justification. In the study the experts charged all independents and no chain store with these costs. Yet, it was not shown that all independents received these services daily or even on some lesser basis. Bowman's studies indicated only that a large majority of independents took these services on a daily basis. Under such circumstances

the use of these cost factors across the board in calculating independent store costs is not a permissible justification, for it possibly allocates costs to some independents whose mode of purchasing does not give rise to them. The burden was upon the profferer of the classification to negate this possibility, and this burden has not been met here. If these factors control the cost of dealing, then their presence or absence might with more justification be the password for admission into the various price categories.[13]

The appellees argue in the alternative that their cost justifications can be sufficiently unscrambled to remove any taint the Court may find in them and still show a cost gap sufficient to justify the price disparity between the chains and any independent. This mass of underlying statistical data not considered by the trial court and now tied together by untried theories can best be evaluated on remand, and we therefore do not consider its sufficiency here.

In sum, the record here shows that price discriminations have been permitted on the basis of cost differences between broad customer groupings, apparently based on the nature of ownership but in any event not shown to be so homogeneous as to permit the joining together of these purchasers for cost allocations purposes. If this is the only justification for appellees' pricing schemes, they are illegal. We do not believe that an appropriate decree would require the trial court continuously to "pass judgment on the pricing practices of these defendants." As to the issuance of an injunction, however, the case is now

---

[13] Another suspect feature is that classifications based on services received by independents were apparently frozen—making it impossible for them to obtain larger discounts by electing not to receive the cost-determinative services—with no justifiable business reason offered in support of the practice.

11 years old and we have no way of knowing whether equitable relief is in order. Certainly a relevant factor in such consideration would be whether the practices described above are still being followed in any form. This the record here does not show. Such matters can only be ascertained upon the presently existing facts and the careful application of the principles we have enunciated. For that purpose the case is

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

This is not a case that involves problems of centralized purchasing by a large enterprise for all its constituent members, where the volume involved reduces the unit cost. We have here purchases by constituent members of chain stores of milk and milk products that will be sold at the particular store. The competitor is not a member of a competing chain or, if it is, the chain of which it is a part is a smaller one. The costs studies here involved have little, if any, relation to centralized management. They in the main pertain to two factors of cost. First, is the volume of sales of milk and milk products to the individual store and the method of payment. Second, the degree to which the store relieves the seller of milk and milk products from the costs of handling the product as it enters the store, of stacking or storing the products, and of returning the empty bottles or cartons.

The changes in the Clayton Act made by the Robinson-Patman Act now before us were made to limit discounts as "instruments of favor and privilege and weapons of competitive oppression." S. Rep. No. 1502, 74th Cong., 2d Sess., p. 5; H. R. Rep. No. 2287, 74th Cong., 2d Sess.,

p. 9. The allowance by § 2 (a) of "differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered" was explained as follows:

"This limits the differences in cost which may justify price differentials strictly *to those actual differences traceable to the particular buyer* for and against whom the discrimination is granted, to the different methods of serving them, and to the different quantities in which they buy.

"But such differentials whether they arise in operating or overhead cost must, as is plainly stated in the phrase quoted above, be those resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered.

"This, in its plain meaning, permits differences in overhead where they can actually be shown as between the customers or classes of customers concerned, but *it precludes differentials based on the imputation of overhead to particular customers,* or the exemption of others from it, *where such overhead represents facilities or activities* inseparable from the seller's business as a whole and *not attributable to the business of particular customers* or of the particular customers concerned in the discrimination. It leaves open as a question of fact in each case whether the differences in cost urged in justification of a price differential—whether of operating or of overhead costs—is of one kind or the other. That is, whether or not it answers the above requirements as to differences resulting from differing methods or quantities in which such commodities are to such purchasers sold or delivered." H. R. Rep. No. 2287, *supra,* p. 10. (Italics added.)

While in some cases costs relevant to the issue of discrimination under the Robinson-Patman Act may be computed class by class, the only costs relevant here are those computed store by store. The question of cost of delivery to all stores in the favored chain is irrelevant, because overhead costs applicable to a business as a unit have no bearing on any of the cost formulae presented by this record.

In the case of *Bowman Dairy Co.*, as the Court points out, the company charged all independents for customer service rendered by Bowman's deliverymen whether the independents availed themselves of the service or not. Bowman also charged independents for the time and expense of daily cash collections and for the costs of delays in collecting. These items were charged to independents even though it was not shown that their system of payment was always in cash, rather than by central billings, the system used by the chains.

In the *Borden* case an independent who purchased substantially larger quantities than the average chain store could not qualify for the discount the chain store obtained. This resulted because the independents were treated as one class, the chain stores as another class. As in *Bowman* the independents who did not make cash payments were treated as if they did; and they were not given the advantage which the chain stores enjoyed by reason of centralized billing even though they were on a credit basis.

What was said in *Champion Spark Plug Co.*, 50 F. T. C. 30, 43, is relevant here:

"Respondent's cost of doing business undoubtedly varied as among its different customers. All of its selling expenses were not applicable on a proportionately equal basis to sales to all of its customers. However, in the absence of a sound basis for determining the actual cost of selling to particular cus-

tomers, the sales to each customer must bear their proportionate share of the entire selling expense. A cost justification based on the difference between an estimated average cost of selling to one or two large customers and an average cost of selling to all other customers cannot be accepted as a defense to a charge of price discrimination."

Where centralized purchasing for many stores takes place, the costs of dealing with the group as a class become relevant to the problem under § 2 (a). But where, as here, no centralized purchasing is involved, the store-by-store costs are the only criteria relevant to the § 2 (a) problem. Otherwise those with the most prestige get the largest discounts and the independent merchants are more and more forced to the wall.

The case was argued as if the grant of discounts was a natural right and that the Act should be construed so as to make the granting of them easy. The Act reflects, however, a purpose to control practices that lead to monopoly and an impoverishment of our middle class. I would therefore read it in a way that preserves as much of our traditional free enterprise as possible. Free enterprise is not free when monopoly power is used to breed more monopoly. That is the case here unless store-by-store costs are used as the criteria for discounts. This case is thus kin to that in *Moore* v. *Mead's Fine Bread Co.*, 348 U. S. 115, where the lush treasury of a chain was used to bring a local bakery to its knees. Here, as there, the chains obtain a "competitive advantage" not as a result "of their skills or efficiency" but as a consequence of other influences.* There price-cutting was

*See *Curtiss Candy Co.*, 44 F. T. C. 237, 267–268, 274; *International Salt Co.*, 49 F. T. C. 138, 153–155, 157; *Champion Spark Plug Co.*, 50 F. T. C. 30, 43.

the weapon. Here it is the discount. Each leads to the same end—the aggrandizement of power by the chains and the ploughing under of the independents. The antitrust laws, of which the Robinson-Patman Act is a part, were designed to avert such an inquest on free enterprise.

MR. JUSTICE HARLAN, dissenting.

The Court treats this case as if the District Court had introduced novel and disruptive principles into the law of "cost justification" under § 2 (a) of the Clayton Act.

Although I consider the respective cost studies much more adequate than the Court credits them with being, it is sufficient to say that, as I read the opinion below, the District Court judged their over-all adequacy in accordance with accepted principles of law in this field. The lower court indeed carefully refrained from giving unqualified approval to either set of cost studies, in substance merely holding (1) that the studies had been conscientiously prepared and prima facie appeared to justify generally the price discriminations arising from the appellees' discount practices (and more particularly to justify those specifically relied on by the Government as "trial" samples); and (2) that, in light of the long-drawn-out history of this litigation, the appropriate disposition was to deny injunctive relief, allowing the Government to bring to the attention of the Federal Trade Commission any other specific price differentials which it believed not justifiable under these or other cost studies.

This seems to me an eminently sensible and fair disposition of this stale litigation which has now been in the courts for nearly 12 years. I can see no point whatever in this Court sending the case back to the District Court for what will presumably amount to a third trial, especially when it is apparent that drastic changes in the

situation complained of by the Government have taken place since 1955.

Had what the record now reveals been fully appreciated at the time the Jurisdictional Statement was considered, a summary disposition of the case would have been called for.*

I would affirm.

---

* The delays occasioned by the overcrowded docket of this Court as well as the nature of the issues in this litigation again point up the inadvisability of vesting sole appellate jurisdiction over this type of case in this Court. See *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 357 (dissenting and concurring opinion).