The **KROGER CO.**, Petitioner,

v.

**FEDERAL TRADE COMMISSION**,
Respondent.

No. 20233.

United States Court of Appeals,
Sixth Circuit.

Feb. 25, 1971.

Norman Diamond, Washington, D. C. (Daniel A. Rezneck, Patrick J. Macrory, Washington, D. C., on the brief), for petitioner. Arnold & Porter, Washington, D. C., George A. Leonard, Vice President and General Counsel The Kroger Company, Cincinnati, Ohio, of counsel.

Karl H. Buschmann, Federal Trade Commission, Washington, D. C. (Joseph Martin, Jr., Gen. Counsel, Harold D. Rhynedance, Jr., Asst. Gen. Council, Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C., on the brief), for respondent.

Before TOM C. CLARK, Associate Justice,* WADE H. McCREE, Jr., and WILLIAM E. MILLER, Circuit Judges.

**CLARK, Associate Justice:**

The Kroger Company brings this petition for review in which it complains of a cease and desist order of the Federal Trade Commission holding Kroger in violation of section 2(f) of the Clayton Act, 15 U.S.C. Sec. 13(f) [1] for having knowingly induced and received from Beatrice Food Company discriminatory prices on fluid milk and cottage cheese as prohibited by section 2(a) of the Act, 15 U.S.C. Sec. 13(a).[2] In the same order the Commission absolved Beatrice from responsibility under section 2(a) of the Act on the ground that its lower price was offered in good faith to meet an equally low price of a competitor, a defense authorized under section 2(b) of

---

* Associate Justice, Supreme Court of the United States, retired, sitting by designation.

1. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."

2. "It shall be unlawful * * * to discriminate in price between different purchasers of commodities of like grade and quality * * * where the effect of such discrimination may be * * * to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided*, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered * * *."

the Act, 15 U.S.C. Sec. 13(b).[3] Kroger seizes upon this circumstance contending that as a matter of law the discharge of Beatrice requires the acquittal of Kroger because there cannot be a violation of section 2(f) without there being one under section 2(a). While ordinarily this may be true—a matter we need not and do not pass upon—it is not true under the peculiar circumstances here, where Kroger was found by the Commission to have given "false price information" to Beatrice as to Broughton's competing bid which induced Beatrice in perfect good faith to meet Broughton's equally low price. Nor do we find substance to the other points raised—all of which we will discuss in more detail —and, therefore, affirm the order of the Commission and direct its enforcement. The portions of the order having to do with Beatrice and other parties who were before the Commission and included in its order are not before us and therefore we express no opinion concerning them.

### 1. The course of the proceeding.

The administrative proceeding began on July 30, 1965, with the filing of a complaint charging Beatrice with discriminating in prices in the sale of fluid milk and other dairy products to the Kroger Company, and other parties, not involved here, in violation of section 2(a) of the Act, as amended. Kroger was charged with knowingly inducing or receiving prices for fluid milk under its own and other private label brands, cottage cheese and other dairy products in its transactions with Beatrice which were discriminatory under section 2(f) of the Act.

It was over two years later that the Hearing Examiner dismissed the complaint because (1) the prosecution under

section 2(a) against Beatrice failed since the discrimination charged did not have the effect condemned by section 2(a); (2) the charge against Kroger under section 2(f) must be dismissed because of the failure of the Beatrice prosecution under section 2(a); and (3) as further grounds, that Beatrice had established a good faith meeting of competition defense under section 2(b) and, as to Kroger, that there was no evidence that Kroger knew or had reason to believe that the prices Beatrice offered were not in fact cost justified or were not offered in good faith to meet an equally low price of a competitior.

On appeal to the Commission the dismissal of the complaint by the Hearing Examiner was set aside as to Kroger and a cease and desist order was entered against it based upon a violation of section 2(f); Chairman Dixon with Commissioners Jones and MacIntyre made up the majority, and Commissioners Elman and Nicholson dissented. The charge against Beatrice was dismissed on its section 2(b) defense and no review was sought; the majority consisted of Commissioners Jones, Elman and Nicholson, with Chairman Dixon and Commissioner MacIntyre dissenting. It is significant to note that none of the dissenters took issue with the Commission's finding concerning the initial bid that the Broughton dairy made to Kroger which led to the resulting discriminatory pricing by Beatrice.

### 2. The background of the parties.

In 1963 Kroger operated a chain of over 1400 retail grocery stores located in some 19 states and which sold a variety of products. Its national volume of sales ran over $2 billion a year, including its milk and other dairy products. Kroger's competition in its Charleston

3. "Upon proof being made * * * that there has been discrimination in price * * * the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section * * * *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price * * * *was made in good faith to meet an equally low price of a competitor * *."* (emphasis added)

Division included national chains such as A & P as well as regional chains and independent supermarkets.

Beatrice is the third largest dairy company in the United States, with $569 million annual sales in 1963. In 1962 Beatrice was one of several dairies serving the various areas within Kroger's Charleston Division. Prior to 1962, all dairy products in this area were vendor branded, and the supermarkets generally carried two or more brands in their dairy cases. Most customers generally received the "full service" method of milk distribution, requiring the routeman to deliver and also stock the dairy case. Prices were generally based on wholesale list prices with discounts to large purchasers. This price structure began to erode in 1962 when larger buyers, led by Kroger, began to demand and get formula prices based on the fluctuating cost of raw milk, and then by private branding of dairy products.

3. The circumstances surrounding the bidding.

In the fall of 1961, Kroger decided to explore private label sales in the hope that its own label might permit it to compete more profitably and effectively. Mr. Francis Casserly, manager of Kroger's Columbus Division, which was then operating a private label milk program, was designated to negotiate with dairies in the Charleston area. Casserly invited several companies, including Valley Bell, Broughton, Borden and Fairmont, to submit bids for bottling Kroger label milk for the Charleston Division.

The first bid received was from Broughton on January 6, 1962. It was in the form of tabulations covering each Kroger store location, showing the existing retail price, the prevailing wholesale price in the market, and a percentage figure for Kroger's gross profit. The Hearing Examiner found that Broughton offered discounts approximating 20 per cent from its list prices. The Commission found that the average discount amounted to "a little less than 11 per cent." It is uncontested that

prices in the bid averaged a discount of 10.9 per cent.

In January, 1962, Beatrice officials, who had heard rumors that Kroger was seeking private label milk, contacted Casserly and arranged a meeting on January 12. At that meeting the volume of business and area to be served were discussed. The Beatrice representatives were asked if they had an offer to make, and they said they were thinking in terms of a 15 per cent discount. Casserly replied, "Well, forget it, I have already got one at 20" off the "existing list price." It stands undenied in the record that a 20 per cent discount was unheard of in the market area at that time. On January 25th Beatrice quoted 21 cents a pound on cottage cheese and Casserly "just told us right quick we weren't in the ballpark."

By letter of January 18, 1962, Casserly had informed the dairy companies that the bidding would be for a sales volume of dairy products in excess of $2 million annually. He indicated that Kroger was interested in some form of reduced service which would cut distribution costs, and requested bid prices based upon the cost of milk rather than discounts from the prevailing price structure.

Beatrice presented its first proposal to Kroger at a meeting with Casserly on February 9, 1962. The proposal included a price of 71 cents for a gallon of homogenized milk, arrived at by applying a discount of 16 to 18 percent for volume to the average price of 85 cents. Casserly told Beatrice representatives that they "might as well go back home" if that was all that they had to offer.

Casserly had not received any quotations lower than the Beatrice 71 cents per gallon bid at this time. The gallon jug was "the big item. That was the thing that really controlled this whole situation" and as the Hearing Examiner indicated, "the award of the contract might hinge on the gallon-jug price—since the 'gallon-jug was the big volume item.'" The first

Broughton proposal contained prices per gallon ranging from slightly over 73 cents to more than 81 cents per gallon. Beatrice Division manager Stollings testified that Casserly nonetheless "told us of the 20 percent Broughton price and he said, you don't have to be a very good mathematician to take an 85-cent average jug price and 20 percent will show you that 71 cents is high." The discussion was promptly terminated. The Commission found that Casserly's rejection was not based on "any true appraisal" of the earlier Broughton offer, but that he simply thought he could get a better price.

Other companies submitted bids. Broughton submitted a second proposal in February for $.7224 for a gallon of milk, and in March proposed prices ranging from $.6586 to $.6879. Fairmont's first proposal quoted prices ranging from $.6585 to $.8168, and later in February quoted prices ranging from $.6526 to $.7255. Borden submitted an offer, which varied according to the service and type of delivery.

On March 14, Beatrice representatives again met with Casserly and "quoted a 66 cents price." As Stollings reported it: "We talked about some of the other pricing. That is on a gallon jug * * * We talked about one or two other prices * * * We sat down across * * * the desk from Mr. Casserly and talked about a method of tying this price. That 66 cent price—I first talked about a 68 which was a 20 per cent discount, the Broughton discount from the 85 cent jug. At the time we were talking about this * * * Casserly said that he had received a bid from Fairmont that was better than this, and also mentioned that prices were 'collapsing' in the Charleston market * * * we worked out—me on one side and Mr. Casserly on the other—the mechanics—he did the mechanics. He had a calculator over there * * * and between the two of us we worked out a formula." Stollings further testified that he talked with Casserly about the 66 cent price, and Casserly replied

that "now you are getting—you are in a position of being competitive with some of the other people."

Beatrice's representatives made it clear that the 66 cent price would have to be approved by the Chicago office. In early April Stollings reviewed the proposal with Beatrice's house counsel and an accounting specialist. On April 9, 1962, Stollings met with Casserly and delivered a revision of the Beatrice proposal which had been approved by the home office. Prices were based on 66 cents per gallon of milk, and 17.5 cents per pound of cottage cheese. Kroger accepted the proposal and the companies began to operate under it in June, 1962.

**4. The Section 2(f) violation.**

Kroger claims that it cannot be found in violation of the discrimination clause of section 2(f) because Beatrice was absolved from its violation of the anti-discrimination provision of section 2(a) on its defense under section 2(b). It relies on a sentence in Automatic Canteen Co. of America v. Federal Trade Commission, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953), "that a buyer is not liable under § 2(f) if the lower prices he induces are either within one of the seller's defenses such as the cost justification *or not known by him not to be within one of those defenses*" at p. 74, 73 S.Ct. at 1025 (emphasis added). But this is just another way of saying, as the Court did earlier in the opinion, that section 2(f) was "roughly the counterpart, as to buyers, of sections of the Act dealing with discrimination by sellers." *Id.* at p. 63, 73 S.Ct. at 1019. That is to say, a buyer may not be prosecuted for inducing discriminatory prices which it knows a seller may offer with impunity under section 2(b). As the Court itself put it:

"[T]he discriminatory price that buyers are forbidden by § 2(f) to induce * * * cannot be read as declaring out of bounds price differentials within one or more of the 'defenses' available to sellers, such as that the price differentials reflect cost differences, fluctuating market conditions, or bona

fide attempts to meet competition, as those defenses are set out in the provisos of §§ 2(a) and 2(b)." *Id.* at pp. 70–71, 73 S.Ct. at 1023.

At first blush it might appear that Kroger's claim might have some merit, i.e. that a defense absolving, its seller under section 2(b) operated *ipso facto* for its own acquittal. However, even granting the validity of such a deduction, *arguendo*, it would not be available here. *Automatic Canteen, supra*, holds only that buyers may avail themselves of discriminatory prices that a seller may lawfully grant or those that are "not known by him [the buyer] not to be within one of these defenses." Id. The Commission found that Beatrice made a bona fide attempt to meet the Broughton bid which it was told by Kroger was the lower one. In so doing Beatrice was in good faith acting within a defense offered by section 2(b). On the other hand, Kroger knew that the Broughton bid was not lower and that the one of Beatrice was, therefore, not in fact responsive to an actual lower bid. In such a factual situation the seller's successful defense under § 2(b) cannot exculpate the buyer since Kroger knew that the prices offered by Beatrice and received by Kroger were not in fact within the defense of section 2(b). To hold otherwise in this case would put a premium on the buyer's artifice and cunning in inducing discriminatory prices. See Kintner, A Robinson-Patman Primer 261, 315–331. In order for the buyer to be sheltered through the exoneration of the seller under section 2(b) the prices induced must come within the defenses of that section not only from the seller's point of view but also from that of the buyer. To hold otherwise would violate the purposes of the Act, and frustrate the intent of the Congress.

The findings of the Commission with regard to the misrepresentation of the Broughton bid are fully supported by substantial evidence throughout the record. Casserly himself testified that the bid was "an average of 20 per cent

* * * a little above on some, a little below on others." Hutchinson, one of the Beatrice negotiators, testified that Casserly told him "I have already got one at 20." And Stollings (another Beatrice negotiator) testified that Casserly said that "he had 20 per cent off from Broughton on this business." The bid actually averaged 10.9 per cent discount off the wholesale list price. We find no denial of this fact in the appellant's briefs. It does contend that Commission counsel agreed before the Hearing Examiner that the bid was 20 percent. But Commission Counsel fully explained this. They admitted that in its original proposed findings to the Examiner it stated that the Broughton bid was 20 percent off. But soon thereafter in its reply findings it told the Examiner that this was an error. It said that only four stores "were granted prices as low as .658, .66 and .68" while all of the others ranged from 73.2 cents to 85.65 cents per gallon. It further stated that cottage cheese—an important item—was "extremely high" in comparison to the final Beatrice proposal. At the time of the Broughton bid the one of Beatrice was 2 cents below Broughton on forty of the forty-four stores, and the four lower price stores were comparatively small outlets of Kroger. Moreover, in its appeal brief to the Commission counsel discussed and denounced the bid under the heading: "Kroger Misled the Dairies Concerning Receipt of a 20% Discount Offer." At argument before the Commission when Kroger pointed to the proposed finding to the Examiner as an admission that Broughton's bid was 20 percent off the Commission, counsel again repudiated this claim and called the attention of the Commission to its prior rejection.

**5. Other contentions.**

We need not pause long with the remaining claims. The complaint clearly charges Kroger in the exact terms of the Act which, of course, is sufficient. Nor is there substance to the objection that

the case was tried on a different theory before the Commission than that pursued before the Hearing Examiner. The release of Kroger by the Hearing Examiner on the theory that it was required because of the acquittal of Beatrice was, of course, attacked before the Commission and caused more attention to be focused on Casserly's testimony. But counsel for the Commission maintained to the Examiner that Casserly had misrepresented the Broughton bid. It necessarily had to give more emphasis to the Casserly testimony in its presentation to the Commission in order to meet the Hearing Examiner's order exculpating Kroger. Indeed, Kroger's strategy before the Hearing Examiner emphasized that its responsibility could not be judged by the acts of Beatrice. Kroger's own counsel repeatedly objected before the Hearing Examiner to the relevance of certain evidence as to Kroger but not to Beatrice on the ground that "independent acts of Party A had nothing to do with the responsibility of Party B." That is exactly the theory on which the Commission acted in finding Kroger responsible.

■ Moreover, we find no support for the charge that the Commission's holding places the buyer at his peril whenever he engages in price bargaining. The use by the Commission of the "hard bargaining" language as well as the failure of Kroger "to convey any correct information about the price levels being quoted by others" is but a warning, not a command. The controlling point here is not the "hard bargaining" nor the price levels" but the *misrepresentation* of the Broughton bid, in order to induce a discriminatory price.

Finally, Kroger argues that the Commission failed to meet the burden of proving that Kroger knew or should have known that Beatrice's prices were not cost justified, and there was no substantial evidence that the differentials on Kroger's private label product injured competition. We find that there is substantial evidence supporting each of the Commission's findings, including these.

As to cost justification, the showing of Beatrice was found by both the Hearing Examiner and the Commission to be entirely inadequate. We agree with this finding. In addition, Kroger was specifically warned by two dairy suppliers of Robinson-Patman Act problems that might result from the lower prices it sought. Still its expert in the purchasing and selling of dairy products, Mr. Casserly, pursued his course. He was a man of extremely wide experience in every line of the dairy industry, including the production, processing and retailing of such products. He knew trade discounts, market conditions and cost accounting. Indeed, Casserly himself built up the cost formula which resulted in discriminations aggregating 39 per cent in some markets and as high as 41 per cent on cottage cheese. In these lights—coupled with the other circumstances surrounding the transaction—it is beyond question that Kroger knew—or should have known—that Beatrice's prices were not cost justified.

[5] Likewise the differentials that Kroger received impaired competition. We start with the proposition that evidence of discrimination in only one area is sufficient to meet the requirements of the Act. Foremost Dairies, Inc. v. Federal Trade Commission, 348 F.2d 674, 681 (C.A.5 1965), certiorari denied, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362. Moreover, "a substantial price advantage can afford a favored buyer a material capital advantage * * * which will give him a substantial advantage over his competition." Therefore, as the Fifth Circuit said in *Foremost, supra*: "It is unnecessary that there be evidence that the favored customer actually undersold his rivals." *Id.* at 680. See also National Dairy Products Corp. v. Federal Trade Commission, 395 F.2d 517, 522 (C.A.7 1968), certiorari denied 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438.

In this case Kroger contends that its purchase of vendor labeled milk from Beatrice should be aggregated with its purchases of private label milk. Federal Trade Commission v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 163 (1966). We think that the Commission correctly rejected the application of this principle since Beatrice labeled milk was only sold in 11 of the 44 stores in the relevant areas. Moreover, the large Charleston and Logan areas received no Beatrice labeled products and the all-important gallon jug was not available under the Beatrice label in any Kroger store. Furthermore, *Borden* recognizes the competitive advantage which results when disadvantaged competitors are denied a label which the favored buyer receives. Kroger reaped this very advantage. It received Kroger labeled milk at cheaper milk and consequently placed its label in a competitively superior position. It did not reduce the retail price of its private label milk and, thereby, pass on lower prices to the consumer, but reaped higher profits for itself. The result was that it sold enormous quantities of milk at higher profits, as is clearly shown by its own chart in Addendum I to its brief filed in this court.

However, the point that the Commission should have treated the private labeled product and the nationally branded one as "goods of like grade and quality," *Borden, supra,* need not be labored. Beyond any question in the three market areas where both labels were sold the discrimination ran from 9.7 to 30.8 per cent and averaged 16 per cent.

The Commission properly inferred that there was a reasonable probability of substantial injury to competition since the discriminations were as high as 41 per cent (in cottage cheese); averaged in one market more than 28 per cent, for other markets 17 per cent, and in Charleston, the most important area, more than 12 per cent. See chart, page 34, Commission's brief. The discrimination here is among the highest in a litigated case under the Clayton Act.[4] The record shows that in the retail food business "competition is keen and profit margins are low" Foremost Dairies, Inc., *supra,* 348 F.2d at 681; National Dairy Products Corp., *supra,* 395 F.2d at 522; Fred Meyer, Inc. v. Federal Trade Commission, *supra,* 359 F.2d at 367. In addition it is uncontested that dairy products are often used as "leaders" to attract customers. It follows that the injury found to be present involving a secondary-line here permits wide inferences of adverse competitive effects based on the existence of substantial price differentials. Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 46–47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); American Motors Corporation v. F.T.C., 384 F.2d 247, 250–251 (C.A.6 1967), Cert. denied 390 U.S. 1012, 88 S.Ct. 1260, 20 L.Ed.2d 164; Foremost Dairies, Inc. v. F.T.C., *supra,* 348 F.2d at 679–680; National Dairy Products, Inc. v. F.T.C., *supra,* 395 F.2d at 522; United Biscuit Co. v. F.T.C., 350 F.2d 615, 622 (C.A.7 1965), cert. denied 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 845. Indeed, in wholesale fluid milk sales discounts from 5 percent to 12 percent have been held to have the required competitive effect on the secondary-line level, Foremost Dairies, Inc. v. F.T.C., *supra,* 348 F.2d at 679; Dean

---

4. Examples of discounts in secondary-line injury cases may be found in United States v. Borden Co., 370 U.S. 460, 463–464, 82 S.Ct. 1309, 8 L.Ed.2d 627 (11%); Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 41, 68 S.Ct. 822, 92 L.Ed. 1196 (5% to 10%); National Dairy Products Corp. v. Federal Trade Commission, 395 F.2d 517, 521 (C.A.7, 1968), cert. denied, 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (12%); Foremost Dairies, Inc. v. Federal Trade Commission, 348 F.2d 674, 675 (C.A.5, 1965), cert. denied, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (5%); Dean Milk Co. v. Federal Trade Commission, 395 F.2d 696, 708 (C.A.7, 1968) (2% to 10%); and Fred Meyer, Inc. v. Federal Trade Commission, 359 F.2d 351, 364 (C.A.9, 1966), rev'd on other grounds, 390 U.S. 341, 358, 88 S.Ct. 904, 19 L.Ed.2d 1222 (33%).

Milk Co. v. F.T.C., 395 F.2d 696, 708–709 (C.A.7 1968); National Dairy Products Corp. v. F.T.C., *supra*, 395 F. 2d at 522.

We follow the teaching of *Automatic Canteen, supra,* where the court emphasized:

> "[T]he buyer whom Congress in the main sought to reach was the one who, knowing full well that there was little likelihood of a defense for the seller, nevertheless proceeded to exert pressure for lower prices. Enforcement of the provisions of § 2(f) against such a buyer should not be difficult." 346 U.S. at 79, 73 S.Ct. at 1027.

The order of the Federal Trade Commission is affirmed and enforced.