**ALLIED ACCESSORIES AND AUTO PARTS COMPANY, INC., a Michigan corporation, Plaintiff-Appellant,**

v.

**GENERAL MOTORS CORPORATION, a Delaware corporation, Defendant-Appellee.**

No. 85–1989.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1986.

Decided July 23, 1987.

Jerome D. Frank (argued), Lori Lutz, Shapack, McCullough & Frank, Bloomfield Hills, Mich., for plaintiff-appellant.

John B. Clayton (argued), Gen. Motors Corp., Detroit, Mich., John W. Sibley, Farmington Hills, Mich., for defendant-appellee.

Before ENGEL and JONES, Circuit Judges; and ALLEN, Senior District Judge.*

* The Honorable Charles M. Allen, United States District Court for the Western District of Kentucky, sitting by designation.

NATHANIEL R. JONES, Circuit Judge.

Allied Accessories and Auto Parts Company, Inc. ("Allied"), appeals the district court's judgment for defendant following a bench trial on its price discrimination claim brought pursuant to the Robinson-Patman Act, 15 U.S.C. § 13 (1982), seeking treble damages under *id.* § 15. Because the district court erroneously required plaintiff to demonstrate that defendant's price discrimination was the sole cause of plaintiff's lost profits, and because defendant's cost justification analysis was based upon groupings impermissible under *United States v. Borden Co.*, 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed.2d 627 (1962), we reverse and remand.

Allied is a wholesale distributor of automobile parts and accessories to mass merchandiser retailers. During the years 1972 to 1979, one of Allied's largest retail customers was the K Mart Corporation ("K Mart"). However, Allied had only once, for a few months, sold oil filters to K Mart. Prior to 1978, Campbell Filter Company ("Campbell") had supplied to K Mart oil filters manufactured by Campbell and sold under the K Mart name. Campbell also manufactured the Fram oil filters that K Mart sold.

In 1978, K Mart decided to change its marketing of oil filters. It switched to a policy of selling Original Equipment Manufacturer ("OEM") filters, i.e., oil filters manufactured by automobile companies for the cars they build. K Mart had a policy of buying direct from the manufacturer whenever possible, since that was usually the best way to get the lowest price. For some reason, however, General Motors Corporation ("GM") could not sell direct to K Mart the AC–Delco oil filters manufactured for GM cars. Instead, GM signed a contract with Campbell allowing Campbell to purchase AC–Delco oil filters for the sole purpose of supplying K Mart. This agreement provided Campbell with a price discount 10 percent below warehouse distributor prices. This discount was not made available to Allied.

Several companies submitted bids to K Mart for supplying AC–Delco oil filters. The lowest bid was submitted by Campbell, and the second-lowest bid was submitted by Allied. The bid that was submitted by Campbell was 10 percent lower than plaintiff's bid. K Mart subsequently chose Campbell as its supplier for AC–Delco oil filters.

Allied brought suit in federal district court, alleging that GM's discount to Campbell violated the Robinson-Patman Act. The district court agreed with plaintiff that GM charged different prices for the same goods. It also agreed that Allied and Campbell were competitors, "since Campbell was stepping outside of its prior posture as a manufacturer and becoming a supplier, and offering to supply the same product to K Mart as was plaintiff." J. App. 25. The district court's first basis for disagreement with plaintiff was that the district court did not believe, as plaintiff did, that Allied would have been selected as K Mart's supplier "but for" the difference in price between Allied and Campbell. J. App. 27, 29. The district court found that price was not K Mart's *sole* consideration in choosing a supplier since "K Mart's policy was to stay with an established vendor. However, in the event a lower price was offered by a new vendor, K Mart policy was to go back to the established vendor to see if the new price could be met." J. App. 28. Because K Mart had previously only dealt regularly with oil filter manufacturers, only a manufacturing company like Campbell could be an "established vendor" for the purposes of this policy. Thus, although a great deal of testimony pointed to price as K Mart's primary consideration, *see, e.g.,* J. App. 147, 148, 306, the district court held that an established vendor like Campbell would have had an advantage even if its price had not initially been lower.

### I.

Although the district court's factual conclusion that price was not the sole basis for K Mart's decision is not clearly erroneous, the district court was incorrect in its assumption that Allied must show that GM's price discrimination was the *sole* cause of its failure to receive the K Mart account. In *Zenith Corp. v. Hazeltine,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), the Supreme Court noted that in order to demonstrate damage under 15 U.S.C. § 15, "[i]t is enough that the illegality is shown to be a *material cause* of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury...." 395 U.S. at 114 n. 9, 89 S.Ct. at 1571–72 n. 9 (emphasis added). The Seventh Circuit in *Bohack Corp. v. Iowa Beef Processors, Inc.,* 715 F.2d 703 (7th Cir. 1983), relied on *Zenith* in approving the following jury instruction:

> The plaintiff does not claim nor is he obligated to prove that the violation was the sole and only cause of the loss of profit. It must, however, show that the violation played a substantial part in bringing about or causing the loss of sales and the loss of profit.
>
> \*   \*   \*   \*   \*   \*
>
> Plaintiff need not show that the price discrimination was a more substantial cause of injury than any other....

*Id.* at 711 n. 9.

Apparently the trial judge's application of an erroneous legal standard on causation may have been induced by arguments the plaintiff made in its own trial brief, wherein it indicated that it intended to show that "to the extent that any logical questions would exist with regard to either the injury or the damages, these questions all arise out of a situation created solely by General Motors' wrongdoing in price discrimination." This and another reference in its brief that plaintiff would prove that it would have obtained A–C Delco oil filter sales "but for" GM's price discrimination, combined with its failure to cite the correct standard, indicates that the plaintiff may have been the author of its own downfall. Nevertheless, this fact is insufficient to permit us to let the trial court's decision stand without a remand and a reconsideration in accordance with what is now well agreed to be the proper standard of law.

We believe it would be error here for us to reevaluate the evidence and findings in the light of the proper legal standard, as this would be precisely the type of appellate fact-finding which the Supreme Court abjured in *Pullman-Standard v. Swint,* 456 U.S. 273, 293, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982). *Swint* does, of course, excuse the normal obligation to remand where an application of the correct legal standard to the record permits only one resolution of the factual issue. *Id.* at 292, 102 S.Ct. at 1792. Here, however, while the trial court's factual finding regarding causation is not clearly erroneous, we are unable to hold that the trial judge, considering the evidence in the light of the law as it properly is, would invariably conclude that plaintiff had not established causation. We therefore remand this issue for further consideration by the district court according to the correct legal standard.

## II.

■ If on remand the district court were to find that GM's 10 percent discount to Campbell was a material cause of Allied's failure to receive the K Mart account, plaintiff would still be unable to recover damages if we were to affirm the district court's holding that:

> Taking into account defendant's assertions of inaccuracies and inability to reflect true damages, the court concludes that an accurate finding of damages would be merely speculative. The Court is unable to determine a proper allocation of plaintiff's operating expenses, a proportionately fair reduction occasioned by defendant's lower price discount in 1981, and an accurate determination of lost profits. The Court therefore declines to find that damages are ascertainable.

J.App. 32–33. However, a remand on the causation issue is not futile, because we hold that the district court has clearly applied too stringent a standard for proof of damages in this case. The Tenth Circuit has succinctly summarized the degree of certainty required to prove damages in an anti-trust case:

If the plaintiff has demonstrated some damage, the actual amount need not be proven to the same degree of certainty. *King & King [Enterprises v. Champlin Petroleum Co.,* 657 F.2d 1147, 1158 (10th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982)]. "[A] plaintiff is not to be held to a rigid standard of proof regarding the amount of damages, since in such cases economic harm is frequently intangible and difficult to quantify." *Id.* at 1157.

"[W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show [sic] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). *World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1478 (10th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). *See also Los Angeles Memorial Coliseum Comm'n v. NFL,* 791 F.2d 1356 (9th Cir.1986) (plaintiff need only provide sufficient evidence to submit a just and reasonable estimate of damages).

In the case at hand, there was not a lack of evidence from which to compute the appropriate damage award. Rather, there were simply several disagreements between the parties concerning the facts that should be used in order to calculate the damages. For instance, defendant's witness Van Hollenbeke testified that it would have been "more fair" if Allied had allocated its operating expenses differently; but Van Hollenbeke also admitted that Allied's allocation was *not* improper. J.App. 279. With respect to the amount of lost profits, defendant alleged that Allied would not have had as high a profit margin as it claimed in light of the price that K Mart would have been willing to pay and the industry's normal profit margin. That the parties disagree about facts like the appro-

priate accounting method, and how high a price Allied would have charged K Mart, does not render damages unascertainable. All it means is that the district court will have to make a factual determination rather than relying on the parties' consensus. *See, e.g., S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F.Supp. 1014, 1030–36 (S.D.N. Y.1984), *aff'd* 762 F.2d 990 (2nd Cir.1985). Damages are only speculative when the evidence is inadequate to supply the basis for such a determination, and in this case both parties clearly presented evidence sufficient for the determination of damages.

### III.

■ A remand for application of the correct causation standard would also be futile if we were to affirm the district court's holding that the defendant has sustained its burden of proving the price discount to be cost justified. *See* 15 U.S.C. § 13(a), (b). But because the defendant's cost justification analysis is virtually a textbook example of the analysis prohibited by *United States v. Borden Co.*, 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed.2d 627 (1962), we reverse the district court's holding on this issue. In *Borden Co.*, the Supreme Court noted that the cost justification proviso of the Robinson-Patman Act, along with its legislative history, could support a requirement that "any discrepancy in price between any two purchasers ... be individually justified...." *Id.* at 468, 82 S.Ct. at 1314. Nevertheless, in light of the burden that such a requirement would impose on sellers with large numbers of customers, the Court chose not "to completely renounce class pricing." *Id.* However, the Court cautioned that:

> [t]his is not to say that price differentials can be justified on the basis of arbitrary classifications or even classifications which are representative of a numerical majority of the individual members. At some point practical considerations shade into a circumvention of the proviso. *A balance is struck by the use of classes for cost justification which are composed of members of such selfsameness as to make the averaging of the cost of dealing with the group a valid and rea-*

*sonable indicium of the cost of dealing with any specific group member.*

*Id.* at 468–69, 82 S.Ct. at 1314 (emphasis added).

In the case before us, GM created two classes in order to determine what price discount to Campbell could be cost justified. One class was composed of all 2,000 of its regular customers. According to defendant's witness, Van Hollenbeke, this class included warehouse distributor/feeders like plaintiff, retailer/manufacturers like Firestone and Goodyear, and warehouse distributors who sold through jobbers and affiliated jobbers. J.App. 227–29. This class was not broken down by geographic areas, by volume of purchases, or in any other way. The other class was composed of Campbell alone. The apparent rationale behind this classification was that all of GM's regular customers had an agreement with GM that entitled them to request advertising reimbursements, catalogues, the services of field representatives, and the benefits of GM incentive programs. Campbell, on the other hand, was offered a special contract wherein rights to incentive programs and cooperative advertising were waived. Furthermore, the services of field representatives and the provision of free catalogues would not be available to Campbell under this contract. This individualized contract provided that Campbell would buy oil filters only for sale to K Mart.

In order to determine the cost savings of selling to the "Campbell class," as compared to the class of all other customers, GM isolated six areas of expenses which affected GM's costs in distributing oil filters. With respect to its volume incentive program, cataloging, and field selling, GM totaled its actual national annual expenses and divided that by the number of oil filters it manufactured in order to arrive at the average per filter cost of providing those services to its class of 2,000 customers. Because GM did not intend to provide those three services to Campbell, it deducted that average cost per filter from its normal warehouse distributor price in order to determine part of Campbell's price dis-

count. With respect to freight costs, GM figured the national average cost of shipping a filter by truck and compared that national average to the cost of using "piggyback" shipping to send filters to Campbell in Dexter, Missouri. The difference between the national average shipping cost per filter and Campbell's projected cost per filter was further deducted from the normal warehouse distributor price. Finally, with respect to its "T'n'P Incentive Program" and Co-op advertising, GM did not use figures derived from its 2,000 customers' actual use of those programs in order to determine the cost per unit of those services. Instead, GM assumed that all 2,000 customers used the maximum available amount of those services, and upon that assumption it calculated the average cost per unit for those services. Since those services would not be available to Campbell, that average cost per unit was also subtracted from the normal warehouse distributor price.

As noted at the outset, this method of justifying a price discount violates a number of the principles set forth by the Supreme Court in *Borden*. First, defendant never offered to the class of 2,000 the option of giving up the additional GM services which Campbell was permitted to forego. *See Borden*, 370 U.S. at 471 n. 13, 82 S.Ct. at 1315 n. 13 (suspect feature of defendant's cost justification was that services to be received by independents were "frozen"); *In re Mueller Co.*, 60 F.T.C. 120, 130 (1962) (unless right to perform additional services made available to all wholesalers, price discount to one who performed additional services illegal), *order enforced*, 323 F.2d 44 (7th Cir.1963), *cert. denied*, 377 U.S. 923, 84 S.Ct. 1219 (1964). Although GM did have a previous agreement with its 2,000 customers, nothing in that agreement would seem to prohibit the formation of a new agreement, and GM offers "no justifiable business reason" for refusing to give its regular customers the opportunity to elect not to receive the cost-determinative services. *See Borden*, 370 U.S. at 471 n. 13, 82 S.Ct. at 1315 n. 13.

Turning to the classifications used by GM for its cost justification, we find that

GM, like the defendant in *Borden*, "not only failed to show that the economics relied upon were isolated within the favored class but affirmatively revealed that members of the classes utilized were substantially unlike in the cost saving aspects considered." *Id.* at 469, 82 S.Ct. at 1314. In regard to the cost savings allegedly peculiar to Campbell as a distributor of oil filters, plaintiff correctly notes that several of the services not provided to Campbell would have been unnecessary for any distributor selling to K Mart. For instance, Van Hollenbeke testified that K Mart refused to deal with sales people. Therefore, any distributor purchasing oil filters for eventual sale to K Mart would save GM its field selling costs for those filters. A contract entitling a distributor to GM's field selling services would not alter the fact that the distributor could not use those services for any sale to K Mart. Thus, some of the cost savings attributed to a sale to Campbell would have been garnered in any sale of oil filters for eventual distribution to K Mart. If GM wished to pass on this cost savings, it should have passed it on to all of its customers, not just to Campbell. *See generally* 3 E. Kintner & J. Bauer, *Federal Antitrust Law* § 23.12 (1983).

Even more troublesome is GM's grouping of all its customers into a single 2,000 member class for the purposes of determining that Campbell was entitled to a price 10 percent lower than any other buyer. To say that all 2,000 had a contract entitling them to certain services by GM is not to prove that all of GM's customers possessed "such selfsameness as to make the averaging of the cost of dealing with the group a reasonable indicium of the cost of dealing with any specific group member." *Borden*, 370 U.S. at 469, 82 S.Ct. at 1314. The defendant in *Borden*, like GM here, attempted to rely on the costs of "optional customer service" generally provided to independent stores as costs attributable to all independent stores. The Court held that since Borden had been able to show only that a majority of the independent stores took advantage of the optional services, not

that *all* independent stores used the services, it was impermissible to allocate those optional service costs to all the independent stores. *Id.* at 470–71, 82 S.Ct. at 1314–15.

Similarly, in the instant case GM has not demonstrated that even a majority of its 2,000 customers take any advantage of services like cooperative advertising or the provision of catalogues. Even if all of its customers do use such available services, GM has given no affirmative indication of the similarity in the degree to which such services are used by various types of customers. For instance, on cross-examination, Van Hollenbeke indicated that buyers who also retail would be more likely to use co-op advertising and admitted that a warehouse distributor/feeder might use up less field selling time than a jobber. But GM never attempted to demonstrate that any such differences were insignificant.

In light of the widely varying characteristics of GM's 2,000 customers, it is not self-evident that the average cost of dealing with all 2,000 is a reasonable indication of the cost of dealing with any one particular buyer. For example, plaintiff points out that as a large warehouse distributor selling primarily to large discount retailers, it neither needs nor uses many of GM's optional services, whereas a jobber or a retailer might use as many of GM's services as possible. Especially telling is GM's use of a national average for comparing shipping costs. While shipping to Campbell in Missouri cost less than the national average, Van Hollenbeke admitted that since GM's plant was in Michigan and plaintiff was also located in Michigan, shipping to plaintiff was "potentially" cheaper than shipping to Campbell.

Altogether, GM's comparison of Campbell to a single class of 2,000 is justifiable only on the assumption that all of GM's customers consistently used similar amounts of the services to which they were entitled. We do not believe that *Borden* permits such an assumption. *See id.* at 470, 82 S.Ct. at 1314. We therefore hold that defendant has failed to prove that its price differential was cost justified.

Accordingly, we REVERSE the district court's judgment for defendant and REMAND for further proceedings consistent with this opinion.